PEOPLE v TYSON

Docket No. 73774. Argued June 6, 1985 (Calendar No. 25).—Decided
    November 18, 1985.

    Schweidel Tyson was convicted, after two mistrials, in the Wayne
        Circuit Court, Irwin H. Burdick, J., of armed robbery and
        possession of a firearm during the commission of a felony. The
        Court of Appeals, V. J. BRENNAN, P.J., and WAHLS and DODGE,
        JJ., affirmed (Docket No. 61835). The defendant appeals, alleg-
        ing that his retrial was barred on double jeopardy grounds
        because his second mistrial was precipitated by intentional
        prosecutorial misconduct or gross negligence and that the
        prosecutor's closing argument was so prejudicial as to require
        reversal of his convictions.

        In an opinion by Justice BRICKLEY, joined by Chief Justice
        WILLIAMS and Justices LEVIN, RYAN, CAVANAGH, and RILEY, the
        Supreme Court held:

        During the defendant's second trial, there was neither inten-
        tional misconduct nor overreaching on the part of the prose-
        cutor, and the defendant was properly retried on the charges.
        During his third trial, the prosecutor's statements during clos-
        ing argument were prejudicial, and their effect was not cured
        by giving defense counsel an opportunity to attempt to balance
        the error.

        1. Generally the federal and state guarantees against being
        placed twice in jeopardy for the same crime do not bar retrial
        of a defendant after a prior trial has been terminated following

REFERENCES FOR POINTS IN HEADNOTES

[1] Am Jur 2d, Criminal Law §§ 263-265.
    Double jeopardy as bar to retrial after grant of defendant's motion
    for mistrial. 98 ALR3d 997.

[2] Am Jur 2d, Criminal Law §§ 285 et seq.
    See the annotations in the ALR3d/4th Quick Index under Mistrial.

[3] Am Jur 2d, Trial §§ 211 et seq.
    See the annotations in the ALR3d/4th Quick Index under Argu-
    ment of Counsel.

[4] Am Jur 2d, Trial §§ 251 et seq.
    Failure to object to improper questions or comments as to defen-
    dant's pretrial silence or failure to testify as constituting waiver
    of right to complain of error—modern cases. 32 ALR4th 774.

a successful mistrial motion. However, such a bar has been recognized where the defendant's successful mistrial motion is precipitated by prosecutorial or judicial error. In this case, the prosecutor's error in the second trial was insufficient to bar retrial. The record reflects that the prosecutor was pursuing a line of questioning designed to show the jury that the defendant was a sophisticated actor rather than an insane schizophrenic and could change his demeanor at will, depending upon who was watching him. This line of questioning was certainly relevant, and the question regarding any differences in defendant's demeanor following his arrest and at trial was proper. Although the witness' answer exceeded the bounds of the question and resulted in the mistrial, it could not reasonably have been anticipated by the prosecutor. Following the motion by the defense to declare a mistrial, the prosecutor denied that the motion had been intentionally provoked, and the trial judge agreed that there had been no intentional misconduct on the prosecutor's part.

2. The prosecutor's statements during closing argument in the third trial that the defendant's psychiatric expert had testified only because he was paid to do so, was misconduct so prejudicial that it denied the defendant a fair trial. The question whether, and how much, the defendant's expert was being paid to testify was raised for the first time in closing argument, lacked evidentiary support, and was clearly injected in an attempt to impeach the defendant's claim of insanity. This personal attack on the defendant's expert was intended to, and did, distract the jury from the real issues, and required the defendant to defend on an issue that was improperly before the jury. The critical issue in the case clearly was whether the defendant was insane. Because the case was decided on the basis of which expert the jury chose to believe, it was especially important to protect against prosecutorial misconduct designed to impugn the credibility of the defendant's expert witness. The prejudicial effect of the argument was not cured by giving defense counsel an opportunity to attempt to balance the error. He was still forced to counter an argument that had no basis in the evidence adduced at trial.

Reversed and remanded.

Justice Boyle, dissenting, stated that defense counsel, by accepting the trial court's offer to reply in kind to the prosecutor's erroneous reference during closing argument to matters outside the evidence, without renewing his request for a mistrial or otherwise indicating that the court's offer was inadequate to cure the error, waived the error.

133 Mich App 318; 350 NW2d 248 (1984) reversed and remanded.

OPINION OF THE COURT

1. CRIMINAL LAW — RETRIAL — MISTRIAL — DOUBLE JEOPARDY.

Federal and state guarantees against being placed twice in jeopardy for the same crime do not bar retrial of a defendant after a prior trial has been terminated following a successful mistrial motion; however, such a bar has been recognized where the successful mistrial motion is precipitated by prosecutorial or judicial error (US Const, Am V; Const 1963, art 1, § 15).

2. CRIMINAL LAW — PROSECUTING ATTORNEYS — RETRIAL — MISTRIAL — DOUBLE JEOPARDY.

Questions by a prosecutor to an arresting officer regarding a defendant's demeanor following arrest and during trial which were designed to show that the defendant was a sophisticated actor rather than insane, as contended by the defense, were relevant and proper; the fact that the witness' answers exceeded the bounds of the questions and resulted in a mistrial was not intentional prosecutorial misconduct or gross negligence so as to bar retrial on double jeopardy grounds.

3. CRIMINAL LAW — PROSECUTING ATTORNEYS — CLOSING ARGUMENT.

The prejudicial effect of a prosecutor's statement during closing argument that the defendant's psychiatric expert had testified only because he had been paid to do so was not cured by giving defense counsel an opportunity to attempt to balance the error where the defense was still forced to counter an argument that had no basis in the evidence adduced at trial.

DISSENTING OPINION BY BOYLE, J.

4. CRIMINAL LAW — PROSECUTING ATTORNEYS — CLOSING ARGUMENT — WAIVER OF ERROR.

*Defense counsel in a criminal trial, by accepting the trial court's offer to reply in kind to the prosecutor's erroneous reference during closing argument to matters outside the evidence, without renewing his request for a mistrial or otherwise indicating that the court's offer was inadequate to cure the error, waived the error.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Deputy Chief, Civil and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Kim Robert Faw-cett* and *Susan M. Meinberg*) for the defendant.

BRICKLEY, J. We granted leave to appeal in this case to decide whether the state or federal prohibition against double jeopardy should have barred defendant's retrial on armed robbery and felony-firearm charges following a mistrial granted at his request, and whether the prosecutor's closing argument was so prejudicial to defendant that his conviction on those charges must be reversed. We answer no to the first question and yes to the second, and therefore reverse defendant's conviction.

I

Defendant Schweidel Tyson and another man, Tommy Lee Forrest, were charged with armed robbery and possession of a firearm during the commission of a felony in connection with the robbery of Flag's Restaurant in Belleville on December 16, 1980. Defendant's postarrest statements to the police were the subject of a lengthy *Walker*[1] hearing, following which the trial judge ruled the statements involuntary and therefore inadmissible. Essentially, defendant had confessed the crime to police, stating that he had originally planned on robbing a bank, but was deterred when he saw the protective glass covering the tellers' windows.

During direct examination of the officer in charge of the case in defendant's second trial,[2] the prosecutor was pursuing a line of questioning

---

[1] *People v Walker*, 374 Mich 331; 132 NW2d 87 (1965).

[2] The first mistrial came about during the empaneling of the jury. During a break in the proceedings, members of the prospective jury panel apparently overheard in the hallway of the acquittal of Tommy Forrest on the same charges. Both parties consented to the mistrial, and it is not the subject of this appeal.

related to defendant's demeanor during the trial[3]

_____

[3] The series of questions and objections preceding the fatal question were as follows:

"*Q.* Now, have you noticed any difference in his behavior or demeanor during the times that the jury is present in the courtroom and during the times that they are not present.

"*Mr. Hallmark:* Your Honor, I am going to object; that this relates to any pretrial proceedings. The jury can observe themselves what the Defendant's demeanor is. That's their position. It is not for this Officer to testify as to what his demeanor is at times when the jury isn't present. It is what goes on in the courtroom when the jury is present that is evidence in this case, not what this officer may or may not have seen or may or not believe, as to a difference in this Defendant's demeanor.

"*The Court:* The People cannot testify?

"*Mr. Hallmark:* A change. I believe he called it a change in his demeanor between when the jury is in the courtroom and when the jury is not.

"*The Court:* Why not?

"*Mr. Hallmark:* It seems to me it is something out of court and simply the officer's opinion.

"*The Court:* Well, every bit of testimony we heard are about events that occurred out of court.

"*Mr. Hallmark:* I understand that, Your Honor. This is . . .

"*The Court:* Well . . .

"*Mr. Hallmark:* If he is relating it to pretrial proceedings, those are proceedings that the jury has no need to know about.

"*The Court:* We are not talking about any—are you talking about some pretrial proceeding? I didn't gather that out of that question.

"*Mr. Seller:* I intended to include within—I intended to include pretrial proceedings to the extent that they immediately—I am talking about the last couple of days, today, yesterday, the day before. If the court wishes me to limit it to just this trial when the jury is outside of the courtroom. I can do that too, but I had intended to include what has gone on in this Court in the last couple of days. I, of course, am not making reference to any testimony that may or may not have been taken outside of the presence of the jury, I am not talking about testimony at all, I am talking about demeanor.

"*The Court:* Oh, all right.

"*Mr. Seller:* Okay?

"*The Court:* Yes, that's—there is nothing wrong with that.

"*Mr. Seller:* Thank you, Your Honor.

"*By Mr. Seller:*

"*Q.* Now, in looking at the Defendant, watching the way he acts or talks or moves, do [*sic*] notice any difference between the times that the jury is in the room and the times they [*sic*] are not in the courtroom?

"*A.* I feel so, yes.

"*Q.* How so?

"*A.* I feel when the jury is in the courtroom he will sit and just stare straight ahead. He will look down. He will very, very infrequently look over at the jury or attempt to make any conference with his attorney. I feel when the jury is out of the room he is a type of individual who will look all around, and seems like he is putting on sort of an act.

"*Q.* Let me ask you this . . .

"*Mr. Hallmark:* Your Honor, I'm going to object, again. Now, that is definitely an opinion, and it has nothing to do with his observation. It is an opinion and nothing more. That's the whole basis of this, his opinion.

"*The Court:* Well, there is nothing wrong with getting his opinion, but that's a bare conclusion, and it is not helpful.

"*Mr. Hallmark:* I would ask that that statement be stricken from the record.

"*The Court:* The statement that it is an act is stricken. The jury is instructed to disregard it.

"*Mr. Seller:* Thank you, Your Honor.

"*By Mr. Seller:*

"*Q.* Have you had occasion to hear the Defendant talk? Just talk?

"*A.* Yes, I have.

"*Q.* Now, I'm not talking about anything he ever said, just the way he talks. Does he talk normal like you and I?

"*A.* Yes.

"*Q.* Are you familiar with what psychologists and psychology refer to as an effect [*sic*]?

"*A.* No, not that term?

"*Q.* Okay. Let's talk about then the expressions that accompany words. You know, if you are angry your face looked a certain way, pleased, and so there are a certainly [*sic*] set of expressions and gestures that go with the thing we say, and normally one kind fits the other.

"Now, using that as what we are talking about when the defendant —when you seen [*sic*] him talking, saying something, does he have the right kind of an effect [*sic*]; do his expressions kind of fit what he is saying?

"*A.* I felt so, yes.

"*Q.* Did he appear pretty much normal?

"*A.* Very much normal.

"*Q.* Does he appear alert?

"*A.* Yes.

"*Q.* Was there . . .

"*Mr. Hallmark:* Your Honor, again the same objection as to he appears. That's again a conclusion as to what is normal. Who is normal, whether he appears to be, or is alert. Again a conclusion, the whole questioning.

"*The Court:* No doubt about it, it is a conclusion, but it is one which laymen are allowed to make.

"*By Mr. Seller:*

in an apparent attempt to discredit defendant's insanity defense by eliciting testimony that he was "putting on sort of an act." Following testimony to that effect, amid several objections by defense counsel, the record then reveals the following:

> *Q.* Now, the way the Defendant appeared during the booking process immediately after his arrest, does that—did he appear then pretty much then as he appears at times in the courtroom now?
>
> *A.* I don't feel so, other than I would have to say when I first spoke with him he appeared to have a —a feeling of—or *he displayed a feeling of remorse.* [Emphasis added.]

Defense counsel objected and had the jury excused, whereupon the following colloquy occurred:

> *Mr. Hallmark:* Your Honor, I believe the last testimony elicited from the officer was in direct and deliberate violation of this Court's order as to any and all oral and written statements made by the Defendant. It was intended to and it did get across to this jury the notion that the Defendant talked about this offense, and that he showed some remorse, some feeling of guilt. It was deliberately done. And I would ask for a mistrial at this point.

"*Q.* You have seen him not only talk, but talk to people and people talk to him, is that correct?

"*A.* Yes.

"*Q.* Does he respond appropriately when talked to?

"*A.* I feel he does.

"*Q.* And with the accompanying facial expressions when talked to?

"*A.* Yes.

"*Q.* His mannerisms in sitting and walking, do they appear normal?

"*A.* At what point?

"*Q.* Well, simply orientated, is he able to go from one point to another knowing where he is going without wandering around aimlessly?

"*A.* Oh, yes, I feel he knows what is going on.

"*Mr. Hallmark:* I object to the remark if he knows what is going on or not. This officer doesn't know. It is again a conclusion, which he is not allowed to make.

"*The Court:* You can cross-examine him."

*Mr. Seller:* Well, first, as to the notion of it being deliberately done. I can certainly address the Court, and I think it is incumbent upon me to say there was no intention on my part to get into the context of any statements whatsoever, and I think from my perspective it was not deliberate on the officer's part. It is a difficult area sometimes where you search for words. Certainly one can look sorry as well as saying I am sorry, and I don't know whether it got across to the jury, you know, what the defense attorney says it got across. It certainly wasn't intended in any case.

*Mr. Hallmark:* Your Honor, I have been objecting for the last ten minutes to this line of questioning, because it was leading in that direction. The officer indicated, if I am correct in my recollection, expressed a remorse.

*The Court:* I doubt that it was intended to violate any Court's order, but it contains a clear implication that the Defendant said he was sorry he did it. The Motion is granted.

Defendant unsuccessfully moved to bar retrial on the ground that double jeopardy prevented further proceedings because the mistrial was provoked by the prosecutor's deliberate misconduct or gross negligence.

The third attempt at trying defendant resulted in his conviction of both charges. Defendant's insanity defense was unsuccessful. A court-appointed psychiatrist, Dr. Joel Dreyer, testified in support of the defendant's insanity defense, stating his opinion that defendant was a schizophrenic and an alcoholic, and had no impulse control. Testimony from defendant's family and acquaintances revealed that he had exhibited bizarre behavior since childhood, that he had been in several mental hospitals and alcohol rehabilitation centers, and that he had repeatedly attempted suicide by slashing his wrists, the last attempt being two days before the robbery of the restaurant.

During cross-examination of Dr. Dreyer, the prosecutor asked him a hypothetical question which was factually based upon defendant's post-arrest statements, previously ruled involuntary:

> *Q.* Now once it occurred to him to rob the Flag's Restaurant, he couldn't say no?
> *A.* That's right.
> *Q.* Had it occurred to him to rob a bank, he would not have been able to say no?
> *A.* No.
> *Q.* Even if he walked in there and found himself faced with bulletproof glass, he couldn't have stopped himself?
> *A.* Yep, you got it.

Defense counsel objected on the ground that the prosecutor was again attempting to get into evidence a statement that had been ruled inadmissible.[4] Nevertheless, both the prosecution's expert, Dr. Charles Clark, and Officer Lindberg, the officer in charge of the case, were allowed to testify on rebuttal as to defendant's postarrest statements regarding the bank.[5] The court gave a cautionary

---

[4] Following argument outside the presence of the jury, the prosecutor continued his cross-examination on a special record. Although the record is somewhat unclear, it appears that the testimony was not read back to the jury.

[5] Dr. Clark's testimony was as follows:

"*Q.* Would you also tell us what he told you about the crime and what conclusion you drew from that, particularly with regard to whether he knew it was wrong or not?

* * *

"*A.* He told me that he did enter the bank but immediately observed that there was protective glass or plexi-glass surrounding the tellers' windows and he said, 'This put me off the rest.' I asked him what he meant by that. He said he meant it deterred him from robbing the bank. He didn't rob the bank. Instead, he said he went into the Flag's Restaurant next door and in his words, 'ordered some money' while holding the gun on the manager and then exited the restaurant and drove away.

* * *

instruction, admonishing the jury that the statements were to be considered not as substantive evidence that defendant had committed the robbery; rather, they could be used only to show his state of mind.[6]

During closing argument, the prosecutor made several references to the fact that defendant's expert witness, Dr. Dreyer, had been paid for his testimony and that that was his motivation for testifying. He also argued to the jury that Dr. Dreyer was lacking in integrity and that the prosecution's expert, Dr. Charles Clark (employed at the Forensic Center), was an "unbiased expert who

---

"*Q.* Now he further stated to you that he had intended to rob the bank, that he went into the bank and saw that the tellers' windows were closed off with glass, presumably bullet-proof glass. Does that have any significance to you? Then he decides not to rob it, but to rob the restaurant instead. Does that have any significance to you?

"*A.* Yes. It would appear from that report, that he was able to exercise good common sense on that occasion, to assess the situation, to see that it was not a good place to rob and to leave it.

"*Q.* Does it all comport with the notion that it is inconsistent with the notion at all that this Defendant, once he got into his mind to do any crime, to do something wrong, couldn't stop himself?

"*A.* This behavior showed he was able to be deterred from a crime he had intended to commit.

"*Q.* Is that a pretty strong indication that, in fact, the Defendant had the capacity to conform his conduct to the requirements of law?

"*A.* It's really hard to find a much stronger indication of that sort of report."

Officer Lindberg testified:

"*Q.* I'm just asking you to be exact as you can and simply say what it was he said.

"*A.* He said, 'I went into the bank to rob it, but they had glass in front of the teller cage, so I went into the restaurant and told the people to give me the money out of the cash register.' "

[6] The judge ruled:

"*The Court:* Let me make this clear to the jury, that the statements that were made by the accused to the psychiatrist or Dr. Clark or Dr. Dreyer or to Mr. Lindberg who just testified here, is not for the purpose of showing substantive evidence. By that, I mean it is not to be considered by you with respect to the crime with which he has been charged for. It is not for any admission on his part. It is only as to the purpose of his state of mind. It is not to be considered of [*sic*] substantive evidence of his having committed the crime."

works for the State of Michigan.'"[7] Defense counsel

---

[7] The complained-of portion of the closing argument was as follows:

"Now that brings us to the testimony of Dr. Dreyer. Dr. Dreyer took the stand and said, Yeah, he's mentally ill. He's schizophrenic. I know because I'm an intelligent qualified psychiatrist. I talked to him. He told me he's a prophet and I believe him and he exhibited signs of having trouble controlling his emotions and he told me he heard voices that told him he was a prophet. And I guess that's about it. I'm not sure what else he had to say.

"*My position, quite simply, is that Dr. Dreyer is lacking in integrity. Whether these are out and out lies, I don't know. But Dr. Dreyer testified in a way that was in his best interests to testify.*

"*Now what possible interest could Dr. Dreyer have, in testifying that this man is insane? That is easy; money. He gets paid to do it. And what Defendant is going to hire him to testify he is not insane and criminally responsible?*

\* \* \*

"*Mr. Seller: I'm not suggesting necessarily that Dr. Dreyer just came to you and just plain out and out lied for a few bucks. I'm suggesting to you Dr. Dreyer was seeing what he wanted to see, which was insanity, getting him off the hook and getting his fee.* I'm not suggesting, by the way, that he only gets paid if he comes down in favor of the Defendant. *I'm suggesting it is a business. I'm suggesting, therefore, that he's willing to look at what he saw with that kind of an eye, with that kind of self-interest, not the kind of impartial self-interest of a medical man or somebody who was looking objectively at the set of facts.* But I don't know. *Perhaps, as a businessman he doesn't have the kind of integrity he should have.* Therefore, his opinion, I suggest to you, comes out shallow and unsupported by evidence and lacking any relevance.

"I hope very much you could see this, that you can see through Dr. Dreyer. I compare him with Dr. Clark who is here in the courtroom. I don't want to call attention to Dr. Clark, but *contrast the testimony of Dr. Dreyer with Dr. Clark and their positions. Dr. Clark is an unbiased expert who works for the State of Michigan. He is automatically appointed by the Court to examine anybody who has raised the defense of insanity. He has no axe to grind, no reason to come down, one way or the other.* He examines a person automatically and then comes available by law, automatically, to either decide logically whichever side he comes down on, that is the side that is going to call him to testify in trial. He has no connection with me or to the Defendant, in fact, as you heard at the last trial I was in, that Dr. Clark was in, also, he testified on the other side. He testified the fellow, in fact, did meet the requirements of insanity.

\* \* \*

"Getting back to Dr. Dreyer's testimony, he comes in and tells you, As sure as I am Dr. Dreyer—and that means something—as sure as I'm Dr. Dreyer, this man is crazy. Why? Well, I suppose the best thing he had to say was that somewhere in some hospital record he had found somebody had written down 'schizophrenic' years ago in some other place, That's the best thing he had to say.

objected both during and after the prosecutor's
argument and moved for a mistrial because of the
"unfair inferences" made by the prosecutor.[8] The
trial judge declined to grant the mistrial, but
allowed defense counsel to respond to some of the
statements, ruling:

> *The Court:* All right. Number one, the question
> was not asked of the doctor how he was going to
> be paid, during the course of either Direct or

* * *

"The Defendant, when he took that test, was faking it. It is the
People's position he did the same thing with Dr. Dreyer. Dr. Dreyer
bought it. *He bought it because he wanted to buy it, because he gets
paid to do this sort of thing."* (Emphasis added.)

[8] The full text of defense counsel's objection is as follows:

"*Mr. Hallmark:* Your Honor, this is my first opportunity I've had to
address the Court outside the presence of the jury since the Prose-
cutor's Closing Argument. And I have stated at least one objection
during the argument.

"There are several things in the Closing Argument I find objection-
able and prejudicial. Most important of those is the statement by the
Prosecutor that Dr. Dreyer's testimony was paid for. That is an unfair
inference. It is not based upon the testimony. The Prosecutor had
every opportunity to bring out, in testimony from Dr. Dreyer, just
what his status is here. The Court record shows that and we argued
that before, outside the presence of the jury.

"It's been mentioned a number of times. Dr. Dreyer is court-ap-
pointed. The Defendant is indigent. The County is paying for Dr.
Dreyer's services and Dr. Dreyer could make far more money outside
in his own practice, in his own office, than what he could make
coming down here to accept a court appointment.

"I've expressed to the Court in front of the Prosecutor, a number of
times, and I've expressed before Judge Dunn a number of times the
difficulty I had to get any psychiatrist to even consider examining the
Defendant because of the lack of financial payment on the part of the
County, the small amount of payment. There was a great deal of
difficulty, and Judge Dunn personally had to persuade the doctor to
take this case. I think this is an unfair inference.

"It is all the more crucial, because he is the most important
Defense witness in the case. It is extremely prejudicial. If I'm not, in
some manner, allowed to respond to that, I don't see how I can
respond on the basis of the evidence. Of course, no evidence was
introduced as to this Court's appointment as to the amount of money
he's to be paid for this service.

"Again, I'd ask for a mistrial. I believe it is that prejudicial to this
client, to have the doctor's credibility in Closing Argument, to be put
before the jury, which is not in evidence."

Cross-Examination. Strictly speaking, it goes beyond the scope of testimony.

In order to balance one against the other, the Court will permit counsel for Defendant, in his Closing Argument, to state that the doctor—Dr. Dreyer was a court-appointed psychiatrist. If you wish to state he was paid by the County, you may do so, although you are not required to. And I may also state for the record that he or any psychiatrist could get more money in their private practice than by a court-appointment. I think that will balance it off. Anything more, gentlemen?

Defense counsel made the following statement during his closing argument:

I believe in Closing Argument, Mr Seller was just a little bit less than kind to Dr. Dreyer. He indicated that Dr. Dreyer's testimony in this courtroom was bought and paid for; that he wouldn't have testified on behalf of this Defendant if he wasn't bought and paid for. That is what it comes down to. Well, it is unfair, for this reason. He failed to say and he failed to put into evidence when he had the opportunity to do so, that Dr. Dreyer is Court-appointed. That man is indigent. The County of Wayne pays Dr. Dreyer, not that man, not me. He failed to say, also, that Dr. Dreyer can earn far more money sitting in his own office treating patients. He is an active treating psychiatrist. He can make more money in his own practice than he can make sitting on that witness stand in this courtroom and standing around during delays and taking abuse from two attorneys who may not think the same or understand the terminology the same as a medical person or a psychiatrist would.

The Court of Appeals affirmed defendant's conviction of both charges, 133 Mich App 318; 350 NW2d 248 (1984), rejecting defendant's double jeopardy argument and holding that, although the

prosecutor's closing argument was misconduct, that "this claim of error was waived when defense counsel accepted the court's offer to make countering arguments." *Id.,* 325. We granted leave to appeal. 419 Mich 943 (1984).

## II

We turn first to defendant's contention that the mistrial occasioned by Officer Lindberg's response to the prosecutor's question regarding defendant's demeanor following his arrest and at trial should have barred retrial on double jeopardy grounds. Defendant contends that the prosecutor, either by intentional misconduct or gross negligence, precipitated the mistrial by asking a question which was sure to elicit an improper response.

As a general rule, both the federal[9] and state[10] guarantee against being put twice in jeopardy for the same crime does not bar the retrial of a defendant after his prior trial has been terminated following his successful mistrial motion. 98 ALR3d 997 (1980).

Both on the federal and state levels, however, an exception to the rule has developed where the successful mistrial motion is precipitated by prosecutorial or judicial error. Difficulties have arisen, however, both in attempts to define the type of error required for a double jeopardy bar to retrial and in applying the definition to the facts of a given case. As a result of this, different standards have evolved in the federal and state court systems.

The federal standard has evolved through a series of United States Supreme Court cases, culminating in the decision of *Oregon v Kennedy,* 456

---

[9] US Const, Am V.

[10] Const 1963, art 1, § 15.

US 667; 102 S Ct 2083; 72 L Ed 2d 416 (1982). In that case, the Oregon Court of Appeals had barred defendant's retrial for theft of an oriental rug on the ground that the prosecutor's conduct in asking the complaining witness whether his refusal to do business with defendant was because "he [was] a crook" constituted prosecutorial overreaching sufficient to invoke the protections of the double jeopardy clause. *Id.,* 669.

The Supreme Court reversed, holding that

> [t]he circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial. [*Id.,* 679.]

Prior to *Kennedy,* several federal and state courts had relied on language from earlier Supreme Court cases, which had suggested that the standard was not one of subjective intent to cause a mistrial, but rather "prosecutorial . . . overreaching,"[11] " 'bad-faith conduct by [the] judge or prosecutor,' " intended to provoke a mistrial request by the defendant in order to " 'afford the prosecution a more favorable opportunity to convict' the defendant,"[12] or "motivated by bad faith or undertaken to harass or prejudice,"[13] in analyzing issues of this kind.[14]

[11] *United States v Jorn,* 400 US 470, 484; 91 S Ct 547; 27 L Ed 2d 543 (1971).

[12] *United States v Dinitz,* 424 US 600, 611; 96 S Ct 1075; 47 L Ed 2d 267 (1976).

[13] *Lee v United States,* 432 US 23, 33; 97 S Ct 2141; 53 L Ed 2d 80 (1977).

[14] As a practical matter, however, it is only in the most egregious cases that retrial has been barred on double jeopardy grounds, regardless of whether the higher standard of subjective intent or the more lenient standard of overreaching or bad faith harassment is employed.

Since *Kennedy,* some state courts have opted to offer broader-reaching double jeopardy protection under their own constitutions, and have adhered to the pre-*Kennedy* standard.[15]

We find it unnecessary to decide at this time whether Michigan should adopt the pre-*Kennedy* or the *Kennedy* standard of prosecutorial error, because we find that the prosecutor's error in this case was insufficient to meet either standard. The record reflects that the prosecutor was pursuing a line of questioning designed to show the jury that the defendant was a sophisticated actor rather than an insane schizophrenic and could change his demeanor at will, depending upon who was watching him. This line of questioning was certainly relevant, and the question regarding any differences in defendant's demeanor following his arrest and at trial was a proper one. Officer Lindberg's answer exceeded the bounds of the question and could not reasonably have been anticipated by the prosecutor. We also note that, following defense counsel's mistrial motion, the prosecutor denied that the motion had been intentionally provoked, and the trial judge agreed that there had been no intentional misconduct on the prosecutor's part. We concur in the Court of Appeals statement that

See, *e.g., United States v Kessler,* 530 F2d 1246 (CA 5, 1976); *United States v Broderick,* 425 F Supp 93 (SD Fla, 1977); *United States v Martin,* 561 F2d 135 (CA 8, 1977). See generally Note, *Double Jeopardy: An illusory remedy for governmental overreaching at trial,* 29 Buffalo L R 759 (1980).

[15] See, *e.g., State v Oliver,* 57 Or App 567; 646 P2d 107 (1982) (prosecutor discussed armed robbery victim's testimony with police officer in hallway outside courtroom despite order excusing witnesses); *Commonwealth v Miele,* 300 Pa 197; 446 A2d 298 (1982) (unsolicited prejudicial comment by police officer during direct examination); *State v Bodley,* 394 So 2d 584 (La, 1981) (witness for prosecution not included on witness list).

However, in *none* of the above cases was the defendant successful in having a retrial barred on double jeopardy grounds. This continues to illustrate the reality that the prosecutorial overreaching exception does not serve as a carte blanche to prevent reprosecution.

[w]e are unwilling to assume bad intent where the conduct of the prosecutor is, at least, equally consistent with a good faith effort to comply with the court's order. The objective facts do not support defendant's claim of deliberate misconduct. [133 Mich App 321.]

Accordingly, we hold that there was neither intentional misconduct nor overreaching on the part of the prosecutor, and that defendant was properly retried on the charges.

## III

We now turn to the defendant's claim that the prosecutor's statements during his closing argument in the third trial, to the effect that defendant's psychiatric expert had testified only because he was paid to do so, was misconduct so prejudicial that it denied defendant a fair trial. The prosecutor variously referred to Dr. Dreyer as "totally lacking in integrity," "a businessman who gets paid to do this sort of thing," and "testifying in a way that was in his best interests to testify." The trial judge attempted to "balance out" the error by allowing defense counsel to state to the jury that Dr. Dreyer was court-appointed and that the fee paid him by the County of Wayne was less than he could have earned in private practice. The Court of Appeals held that this waived any claim of error by defendant:

We agree with defendant's claim that the argument made by the prosecutor must be considered misconduct. The record clearly supports defendant's claim that the prosecutor was aware that his statements to the jury inaccurately characterized the facts concerning the payment of the court-appointed psychiatrist. This argument appears to

have been a deliberate attempt to inject prejudicial error into the trial. Nonetheless, we believe that this claim of error was waived when defense counsel accepted the court's offer to make countering arguments. Defense counsel could have reasonably believed that these countering arguments successfully undermined the credibility of the prosecuting attorney to the extent that defendant might benefit from having his case decided by this jury. To waive this claim of error was a reasonable tactical choice. We find no manifest injustice even though the trial judge might have done more to correct the misstatements made by the prosecuting attorney. [133 Mich App 325.]

We agree with the Court of Appeals that the prosecutor committed misconduct in his closing argument to the jury. We disagree, however, that the error was waived by counsel's countering statements. Further, we hold that the error was not cured by defense counsel's statements, and therefore reverse defendant's conviction.

In *People v Williams,* 218 Mich 697; 188 NW 413 (1922), the prosecutor charged during closing argument that the defense experts had "prostitute[d] themselves" by testifying in support of defendant's insanity claim. This Court reversed, holding that

[t]he argument of the prosecuting attorney was highly prejudicial and cannot be excused by anything in the record . . . . The testimony of the alienist being in the case it was reversible error for the prosecutor to urge the jury to reject the opinions of the alienists and take his opinion and to ask that this be done on the ground they had not been given the facts. . . . There should have gone forth an instruction . . . that it was not permissible for the jury to take the personal opinion of the prosecutor, and also that the alienists were not subject to the charge of prostituting themselves by coming in as witnesses and giving

their opinion evidence relative to the mental condition of the accused. [*Id.,* 705-707.]

Similarly, in *People v Cowles,* 246 Mich 429; 224 NW 387 (1929), this Court reversed the conviction of defendant where the prosecutor stated during closing argument:

> I don't believe there was ever a more disreputable thing seen—I don't think there was anything more disreputable pulled off in a court of justice, than was pulled off by these two doctors . . . if these two doctors were to put on a stunt like that in a vaudeville show, they would go over big. They would get a big laugh. . . . Now, gentlemen of the jury, we all pay taxes for universities, and they turn out things like that. I ask you, gentlemen, what chance a girl has to defend herself against such testimony? And I tell you that those two doctors are worse than the Indian medicine men or negro voodoos? How any professional man can so prostitute his profession and come in here and swear to such statements as that in a court of justice is beyond me. [*Id.,* 431-432.]

This Court held:

> The prosecuting attorney had a right to analyze the testimony, urge the jury, upon reason existing in the case to reject it and point out, if possible, its inapplicability. But invective, ridicule, injection of his belief, and innuendoes was not permissible argument, and was unfair to the experts and prejudicial to defendant. See *People v Williams,* 218 Mich 697 [188 NW 413 (1922)]. [246 Mich 432-433.]

In the civil context, this Court has likewise refused to let stand verdicts rendered following trials in which one party committed misconduct during closing argument. *Wayne Co Road Comm v*

*GLS LeasCo,* 394 Mich 126; 229 NW2d 797 (1975);
*Kern v St Luke's Hospital,* 404 Mich 339; 273
NW2d 75 (1978); *Reetz v Kinsman Marine Transit
Co,* 416 Mich 97; 330 NW2d 638 (1982).

Today, we reaffirm the rule established in *Williams* and *Cowles, supra.* The closing argument of
the prosecutor in this case squares exactly with
the situations in those cases. The question
whether, and how much, Dr. Dreyer was being
paid for his testimony was raised for the first time
in closing argument, was without evidentiary support, and was clearly injected to attempt to impeach defendant's claim of insanity. This personal
attack on the defendant's expert was intended to,
and did, distract the jury from the real issues, and
required defendant to defend on an issue that was
improperly before the jury. Clearly, the critical
issue in this case was whether or not defendant
was insane. This case, as are so many others, was
obviously decided on the basis of which expert the
jury chose to believe. For this reason, it is especially important to protect against prosecutorial
misconduct designed to impugn the credibility of
the defendant's expert witness.

Because of the high stakes involved in any criminal trial, and because the trial judge in this case
failed to give any cautionary instruction to the
jury to disregard the prejudicial portion of the
prosecutor's closing argument, we decline to employ a harmless-error analysis. Although defense
counsel was given an opportunity to attempt to
balance the error, he was still forced to counter an
argument that had no basis in the evidence adduced at trial.[16]

---

[16] We reject the Court of Appeals holding that defense counsel
waived any claim of error by accepting the court's offer to rebut the
prosecutor's statements during his closing argument. The trial court
already denied his motion for mistrial; he was faced with either

For the foregoing reasons, we reverse defendant's conviction and remand the case for retrial.

## IV

Because it may reoccur on retrial, we briefly address one other claim of error by defendant. Both Officer Lindberg and Dr. Clark, the prosecution's psychiatric expert, were allowed to testify on rebuttal to defendant's postarrest statements, previously ruled involuntary following a *Walker* hearing. The jury was given a cautionary instruction that the testimony was to be used only to show defendant's state of mind, and not for substantive evidence that he had committed the offenses with which he was charged.

Involuntary confessions may not be used for any purpose at trial, either for substantive evidence or for impeachment purposes. *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975), *cert den* 422 US 1044, 1048 (1975). See also *Mincey v Arizona,* 437 US 385; 98 S Ct 2408; 57 L Ed 2d 290 (1978).

The prosecution makes an interesting and novel argument that the statements used in this case were not the type of confession ruled involuntary, and therefore inherently untrustworthy, in *Reed* and *Mincey,* and that this Court should recognize a distinction between statements "involuntary in fact" and those "involuntary in law," and allow the latter to be admitted for impeachment purposes or in rebuttal.

---

letting the extremely prejudicial statements stand unrebutted, only to risk having an appellate court say he waived the error by *not* accepting the court's offer to cure it, or attempt to balance the statement as best he could, within the offer of the trial judge, and hope for the best while still preserving the issue for appeal. The Court of Appeals opinion essentially places a defendant in a no-win situation: he waives the error by accepting the offer and also waives it by declining. This situation hardly allows defense counsel to make, as put by the Court of Appeals, "a reasonable tactical choice."

While we find this argument to be worthy of consideration, we decline to take this opportunity to address it since it is not necessary to our decision today. We have reviewed the *Walker* hearing transcript de novo[17] and find that the trial judge did not clearly err in holding defendant's statements to be involuntary.

V

Defendant also contends that the trial court erred in giving, over his objection, an instruction on the disposition of defendant in the case of his acquittal by reason of insanity. For the reasons stated in our opinion in *People v Goad,* 421 Mich 20; 364 NW2d 584 (1984), there should be no such instruction given on retrial.

VI

We have reviewed defendant's other claim of error and find it to be without merit.

For the foregoing reasons, defendant's convictions are reversed and the case is remanded for a new trial.

WILLIAMS, C.J., and LEVIN, RYAN, CAVANAGH, and RILEY, JJ., concurred with BRICKLEY, J.

BOYLE, J. (*dissenting*). Although I agree that the prosecutor's closing argument erroneously referred to matters outside the evidence, I believe the Court of Appeals correctly concluded that counsel waived the error. As that Court noted, 133 Mich

---

[17] *People v Robinson,* 386 Mich 551; 194 NW2d 709 (1972).

App 318, 324; 350 NW2d 248 (1984), after defense
counsel objected to the argument he stated:

> If I'm not, in some manner, allowed to respond
> to that, I don't see how I can respond on the basis
> of the evidence. Of course, no evidence was intro-
> duced as to this Court's appointment as to the
> amount of money he's to be paid for this service.
> Again, I'd ask for a mistrial.

In response to these statements, the trial judge
stated that he would allow defense counsel to
reply in kind. Defense counsel did so without
renewing his request for mistrial or otherwise
indicating that the trial court's offer was inade-
quate to cure the error.

Contrary to the majority's suggestion, *ante,* pp
376–377, had defense counsel insisted on a mistrial,
he would not have waived the claim that the
prosecutor's bad-faith misconduct so irretrievably
prejudiced defendant that the trial should have
been aborted. Given the fact that the record
already contained one basis for a claim of double
jeopardy, it is understandable that a skillful lawyer
in defense counsel's position would opt not for a
further appellate issue, but for an opportunity to
attack the credibility of the prosecutor and his
expert evidence in closing argument.

Moreover, since even absent objection the appel-
late court will review for error which creates "a
manifest injustice," *People v White,* 25 Mich App
176; 181 NW2d 56 (1970); *People v Lane,* 127 Mich
App 663; 339 NW2d 522 (1983), in accepting the
trial court's offer, defense counsel made not only a
reasonable, but an extremely skillful tactical deci-
sion. I would affirm the judgment of the Court of
Appeals.