*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEVEN JAMES SATTLER,

        Defendant-Appellant.

UNPUBLISHED
May 30, 2024

No. 362468
St. Clair Circuit Court
LC No. 21-001329-FH

Before: FEENEY, P.J., and M. J. KELLY and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of one count of operating while intoxicated (OWI) causing serious impairment of a bodily function, MCL 257.625(5)(b), and one count of OWI causing death, MCL 257.625(4). The trial court sentenced defendant to concurrent prison terms of 24 to 120 months for the OWI causing serious impairment conviction, and 57 to 240 months for the OWI causing death conviction. We affirm.

## I. FACTUAL BACKGROUND

Defendant's convictions arise from a motor vehicle accident that occurred on November 21, 2020, in Casco Township, Michigan. Defendant was driving a John Deere farm tractor on the highway at approximately 8:30 p.m. on a dark night. Thadeus ("Ted") Baranski was driving a Lincoln Town Car, with his wife Karen in the passenger seat, when their vehicle collided with the back of defendant's tractor. Ted and Karen were both seriously injured and later died from their injuries.

Defendant had just backed out of a residential driveway and had traveled approximately 120 feet when he was struck by Ted's car. Defendant told an officer after the collision that he saw the Baranskis' vehicle approaching when he backed out of the driveway, and estimated that it was a half mile away. There was no indication that Ted braked before striking the tractor. Conflicting evidence was presented regarding whether the tractor's lights were operating and activated before the accident. An eyewitness who had been driving approximately 200 feet behind the Baranskis' vehicle when the crash occurred testified that Ted was driving approximately 55 miles per hour,

which was the speed limit. The eyewitness did not see the tractor before the collision and stated that he first realized another vehicle was involved while calling 911.

Defendant's tractor had three light settings: "W" for warning, "H" for highway, and "F" for field. The "W" setting activated yellow flashing warning lights on top of the cab at the front and back. A label inside the cab stated, "Use flashing warning lights on highway unless prohibited by law." The "H" setting turned on the front and back warning lights on top of the cab, the headlights, and red lights at the back of the tractor. The "F" setting activated only white lights at the front and back of the tractor. According to the tractor's manual, the "F" setting is only to be used in the field, not on the highway, because the white lights could blind or confuse drivers. The parties stipulated that the first officer to enter the cab of the tractor after the collision found the light switch in the "F" position. When the police tested the lights, they discovered that the warning lights were not operative and the rear red lights in the "H" setting also were not working.

Defendant was leaving the residence of a friend, Joshua Foster, when the collision occurred. Defendant was at the Foster home for approximately 30 to 45 minutes. He drank while he was there. According to Foster, defendant had approximately two beers. Foster denied that defendant was intoxicated when he left the house. Defendant told an officer after the accident that he drank three hard seltzers during the half hour he was at Foster's home. The parties stipulated that a blood draw after the accident indicated that defendant had a blood alcohol content (BAC) of 0.18.

At his trial, defendant called Timothy Brown, a consulting expert in accident reconstruction and collision analysis. Brown testified that the white lights in the "F" position were enough to allow someone driving 55 miles an hour to be able to see the tractor in sufficient time to avoid hitting it, and opined that the crash was not caused by the lack of red taillights on the tractor. According to Brown, driver distraction is a common cause of accidents, and since there was no evidence that Ted braked or slowed down before the collision, the expert believed that Ted was likely distracted. Accordingly, Brown opined that the crash was likely caused by human error and distraction on Ted's part.

Defendant was charged with two counts of OWI causing death. The jury found him guilty as charged for the count involving Karen, and guilty of the lesser offense of OWI causing a serious impairment of a bodily function for the count involving Ted. Defendant was sentenced as described herein. This appeal followed.

## II. ANALYSIS

### A. PROSECUTORIAL MISCONDUCT

Defendant raises two claims of prosecutorial misconduct on appeal.[1] First, he contends that during closing argument, the prosecutor improperly argued that defendant's performance on

---

[1] We note that "the phrase 'prosecutorial misconduct' has become a term of art in criminal appeals . . . [but] these claims of error might be better and more fairly presented as claims of

the horizontal gaze nystagmus (HGN) field sobriety test demonstrated that his intoxication affected his ability to judge time, speed, and distance while operating his tractor. Second, he claims that the prosecutor improperly cross-examined Brown and improperly commented on his motive for testifying during closing argument.

Because defendant did not object to the prosecutor's comments or cross-examination questioning at trial, these issues are unpreserved. *People v Thurmond*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 361302); slip op at 9. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 453-454; 678 NW2d 631 (2004). In *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999), our Supreme Court explained:

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." [Citations omitted.]

Prosecutors are precluded from making statements of fact to the jury that are not supported by the evidence, but may argue reasonable inferences arising from the evidence as they relate to the prosecution's theory of the case. *People v Lane*, 308 Mich App 38, 67; 862 NW2d 446 (2014). Claims of prosecutorial misconduct are reviewed case-by-case by examining the record and evaluating the prosecutor's conduct in context. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 425-426; 884 NW2d 297 (2015). Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence presented at trial. *People v Caddell*, 332 Mich App 27, 71; 955 NW2d 488 (2020).

During closing argument, while addressing how defendant's intoxication and high BAC affected his judgment and decision-making, the prosecutor commented on defendant's decision to pull out of Foster's driveway despite acknowledging that he could see the Baranskis' vehicle approaching. The prosecutor stated:

> [Defendant] thinks [the Baranskis] are a half mile back because his brain is swimming in a .18 BAC that affects his ability to see, to comprehend, to judge speed and distance. His eyes are bouncing in the process. And that is a failure to yield [the] right of way. That's a decision that goes directly back to drunk driving.

---

'prosecutorial error,' with only the most extreme cases rising to the level of 'prosecutorial misconduct.' " *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015).

The prosecutor also addressed defendant's participation in the HGN test, stating:

> But you know what's the one thing you can't fake? The one test that is absolutely involuntary by the [d]efendant? The eyes. The HGN, horizontal gaze nystagmus test. And when you're looking for the bouncing in the eyes and it's, it's like breathing, you can't control it. You just have, you know, your body's going to force you to breathe. Your eyes are controlled by this, this substance in [defendant's] system. Actually it's the brain which is telling the eyes, you know, causing the eyes to do what it's doing. And what is that? It's nystagmus. So when you follow that stimulus going back and forth . . . if you're impaired your eyes are going to be bouncing, twitching involuntarily.

The prosecutor went on to state that the "involuntary jerking" of the eyes related to nystagmus would affect a person's ability to judge the time, speed, and distance of a vehicle, and the fact that defendant had a BAC of 0.18, which caused his nystagmus, also caused him to misjudge the distance of the Baranskis' vehicle as being a half mile away, when it was really only 884 feet away.[2]

Contrary to defendant's argument, the prosecutor's statements were supported by the evidence and reasonable inferences arising from the evidence. Deputy Russell Nowiski testified that the purpose of sobriety tests are to determine how alcohol affects a person's motor skills and ability to operate a motor vehicle. Deputy Nowiski opined that a BAC of 0.18 would have impacted defendant's ability to safely operate a tractor, including his ability to judge the speed and distance of an approaching vehicle. Further, Sergeant Christopher Tuckey performed sobriety testing on defendant after the collision, including an HGN test. Sergeant Tuckey explained that, during the HGN test, defendant "had a lack of smooth pursuit" and a "jerking motion with the eyes." In more simple terms, Sergeant Tuckey described nystagmus as "[t]he involuntary bouncing of the eye from a stimulus." He described this as "nystagmus at maximum deviation," which occurs when the eyes bounce back in an effort to keep a gaze on the stimulus in front of the person, and that both of defendant's eyes were experiencing this condition. Sergeant Tuckey concluded that defendant had nystagmus in each eye, and testified that if an individual has nystagmus in the eye, it will affect their ability to perceive and react to time, speed, and distance.

The record indicates that the prosecutor's statement that defendant "thinks [the Baranskis] are a half mile back because his brain is swimming in a .18 BAC that affects his ability to see, to comprehend, to judge speed and distance" was supported by the evidence. Further, reasonable inferences arising from the evidence indicate that defendant's eyes were experiencing nystagmus when he backed his tractor onto the highway, which affected his ability to judge the speed and

---

[2] A witness qualified in accident reconstruction testified that the distance from where defendant backed the tractor out of the driveway to the point of impact was approximately 144 feet, and the average amount of time it would take a tractor to accelerate up to its speed of 15 miles an hour, traveling 144 feet, would be 10.9 seconds. The witness calculated that a vehicle traveling 55 miles an hour would cover 884 feet in 10.9 seconds.

distance of the Baranskis' vehicle as it approached. Thus, defendant has not demonstrated that the prosecutor's arguments were improper.

Furthermore, to the extent that the prosecutor's remarks could be perceived as improper, the trial court protected defendant's substantial rights by instructing the jury that statements and arguments made by counsel are not evidence and that the jury "should only accept things the lawyers say that are supported by evidence." "Jurors are presumed to follow the trial court's instructions, and instructions are presumed to cure most errors." *People v Mullins*, 322 Mich App 151, 173; 911 NW2d 201 (2017). Therefore, defendant has not shown he is entitled to appellate relief on this issue.

Defendant has likewise failed to show entitlement to appellate relief as a result of the prosecutor's alleged misconduct in questioning Brown, defendant's expert witness. Defendant takes issue with the prosecutor's questions and comments regarding whether Brown had a financial motive to testify. Notably, the issue of the fee for Brown's services was initially raised by the defense on direct examination. In response to questioning by defense counsel, Brown explained that he is a consulting expert in accident reconstruction and collision analysis, and in "most cases" he is paid a fee to provide an analysis of a crash. Brown explained that if he does not believe that he can help in a case, he will usually decline the case and will not charge a fee. He also testified that he has been hired to provide an expert opinion in other cases where the party who hired him did not like his opinion. In such cases, Brown generally would not be called to testify.

On cross-examination, Brown stated that in past years he had consulted on an average of 80 to 100 cases a year, but was "at about 45 or 50 currently." Brown stated that he was charging defendant $190 an hour, and he had worked on the case for approximately 40 hours. Additionally, Brown charged $575 for half a day in court, and $1,100 for a full day in court. The prosecutor then questioned Brown as follows:

> *Mr. Soderberg [the Prosecutor]:* And how many days do you have in here so far?
>
> *The Witness:* Well, if this gets done at noon I'll have been here two days.
>
> *Mr. Soderberg:* So at the very least you're getting over $2,000.00 for your appearances so far in this, this hearing, correct?
>
> *The Witness:* That's correct.
>
> *Mr. Soderberg:* Do you, you agree that it's important you testified in your direct examination it's important for experts to remain impartial as part of their analysis and in forming their opinions and so forth, correct?
>
> *The Witness:* I believe the word I used was unemotional.
>
> *Mr. Soderberg:* Unemotional. Unemotional. Detach yourself from the facts of the case, correct?

*The Witness:* No, that's not correct. You're saying detach myself from the facts of the case.

*Mr. Soderberg:* In terms of the emotion of it?

*The Witness:* Sure, the emotions. I'm not detaching myself from the facts of the case.

*Mr. Soderberg:* The facts as they may stimulate emotions, it's important to detach that stimulation?

*The Witness:* Detach the emotions, correct.

*Mr. Soderberg:* Okay. And you agree that it's important for a reconstructionist to remain impartial and neutral in forming your opinions, correct?

*The Witness:* Yes.

*Mr. Soderberg:* You can't let personal feelings in the way of those facts?

*The Witness:* Are you telling me or are you asking me, I'm sorry.

*Mr. Soderberg:* Do you agree?

*The Witness:* I do agree.

After asking Brown about his relationship with defendant, the prosecutor asked Brown if his testimony in this case was "potentially clouded[] . . . with emotion," to which Brown responded, "No."

Defendant relies on *People v Tyson*, 423 Mich 357; 377 NW2d 738 (1985), and *People v Evans*, 335 Mich App 76; 966 NW2d 402 (2020), in support of his argument that the prosecutor's conduct in this case was improper. In *Tyson*, 423 Mich at 373, our Supreme Court reversed the defendant's convictions of armed robbery and felony-firearm because the prosecutor's statements during closing argument were "so prejudicial that [they] denied [the defendant] a fair trial." In that case, the prosecutor stated that a defense psychiatric expert testified only because he was paid to do so and said that he lacked integrity. *Id*. The prosecutor called the expert a "businessman who gets paid to do this sort of thing," and accused him of "testifying in a way that was in his [own] best interests to testify." *Id*. While observing that a prosecutor may comment on testimony presented at trial and encourage the jury to reject the evidence, a prosecutor is not permitted to ridicule, inject his personal beliefs, or make innuendos, all of which are unfair to the defendant and prejudicial to the expert. *Id*. at 375. Moreover, in that case, the amount of money the expert was being paid for his testimony was first mentioned in closing argument, lacked evidentiary support, and required the defendant to defend against a claim that was not properly before the jury. *Id*. at 376. The Court noted that although defense counsel was given an opportunity to attempt to balance the prosecutor's improper arguments, "he was still forced to counter an argument that had no basis in the evidence adduced at trial." *Id*. Therefore, the Court reversed the defendant's convictions and remanded for a new trial. *Id*. at 377.

In *Evans*, 335 Mich App at 78-79, this Court reversed a defendant's conviction of first-degree murder where the prosecutor's cross-examination of a defense expert "repeatedly transgresse[d] well-established boundaries," thereby denying the defendant a fair trial. This Court noted that throughout the prosecutor's cross-examination of the defendant's expert, the prosecutor accused the witness "of being a hypocrite, engaging in deceit, purposely appearing dense, lacking intelligence, and ignoring or hiding evidence to make her opinion more palatable to the jury." *Id.* at 104. This Court noted that the prosecutor attacked the expert personally and characterized the cross-examination as "brutal and improper" and designed to "inflame the passions and prejudices of the jury" rather than explore the legitimate issue of the defendant's mental state. *Id.* at 104-105.

Conversely, in *People v Unger*, 278 Mich App 210, 236-237; 749 NW2d 272 (2008), this Court held that it was not improper for the prosecutor to argue that defense counsel had "bought" the testimony of a defense expert, observing that "counsel is always free to argue from the evidence presented at trial that an expert witness had a financial motive to testify[,]" and that there was evidence that the expert was substantially compensated for his testimony. *Id.* at 237.

Here, defense counsel introduced the issue of Brown being compensated for his work and asked him to address whether that would influence his opinion. Unlike the fact patterns in *Tyson* and *Evans*, the prosecutor's line of inquiry in this case was neither inflammatory nor out of bounds. It was not improper for the prosecutor to further explore this subject on cross-examination, including questioning whether the substantial compensation that Brown was receiving affected his impartiality. As this Court recognized in *Unger*, 278 Mich App at 237, it is entirely proper for a prosecutor to delve into whether an expert witness has a financial motive to testify. The prosecutor's line of questioning was limited to this purpose and was not excessive, nor did it involve the type of personal attacks found in *Tyson* and *Evans*.

Additionally, the prosecutor's comments during rebuttal argument were responsive to defense counsel's arguments that Brown was "the most experienced and reliable expert in this case," and that compared to Deputy Nowiski, "Brown is a much stronger expert who's much more experienced and [has] lots of training in distracted driving." It was not improper for the prosecutor to ask the jury, in evaluating Brown's credibility, to consider that Brown stood to gain considerable compensation in exchange for his opinions. Again, these remarks were not excessive, did not exceed permissible boundaries, and were supported by the evidence at trial. Accordingly, defendant has not demonstrated that the prosecutor's cross-examination of Brown regarding his financial arrangements with defendant, or the prosecutor's related commentary during closing argument, were improper.

## B. JURY INSTRUCTIONS

Defendant next argues that the trial court erred by failing to instruct the jury in accordance with Michigan's rear-end collision and assured clear distance statutes. We disagree.

Defendant concedes that he did not request these jury instructions at trial. Therefore, this claim of instructional error is unpreserved. *People v Czuprynski*, 325 Mich App 449, 466; 926

NW2d 282 (2018).[3] Unpreserved claims of instructional error are reviewed for plain error affecting defendant's substantial rights. *People v Miller*, 326 Mich App 719, 725-726; 929 NW2d 821 (2019).

This Court reviews jury instructions as a whole to determine whether they "sufficiently protected a defendant's rights." *People v Blevins*, 314 Mich App 339, 353; 886 NW2d 456 (2016). "A court must properly instruct the jury so that [it] may correctly and intelligently decide the case." *People v Traver*, 502 Mich 23, 31; 917 NW2d 260 (2018). Jury instructions must include all elements of the crime charge, and must not exclude from jury consideration material issues, defenses, or theories if there is evidence to support them. *Id.*

Defendant complains that the trial court erred by failing to instruct the jury on two potential statutory defenses: (1) the presumption of fault that arises under MCL 257.402 when a driver rear-ends another vehicle; and (2) a driver's duty to operate a vehicle at a speed that permits the driver to stop within the assured, clear distance ahead, MCL 257.627(1).

MCL 257.402 provides:

(a) In any action, in any court in this state when it is shown by competent evidence, that a vehicle traveling in a certain direction, overtook and struck the rear end of another vehicle proceeding in the same direction, or lawfully standing upon any highway within this state, the driver or operator of such first mentioned vehicle shall be deemed prima facie guilty of negligence. This section shall apply, in appropriate cases, to the owner of such first mentioned vehicle and to the employer of its driver or operator.

(b) This section may not be invoked by the owner of any vehicle, the rear of which was struck under the circumstances above mentioned, if the accident occurred between 1 hour after sunset and 1 hour before sunrise, and the vehicle so

---

[3] We disagree with the prosecution's argument that this claim of instructional error is waived. "Waiver is the intentional relinquishment or abandonment of a known right, and one who waives an issue cannot later seek appellate review of that issue." *People v Davis*, 509 Mich 52, 64; 983 NW2d 325 (2022) (quotations and citations omitted). A party's failure to timely assert a right will result in forfeiture, not waiver, of that right. *Id.* Plaintiff cites *People v Kowalski*, 489 Mich 488, 490; 803 NW2d 200 (2011), in support of its argument that this claim of error is waived. What distinguishes this case from *Kowalski*, however, is that defendant's claim of instructional error does not involve a challenge to any of the instructions as given, but rather the court's failure to give the instructions at issue. Defendant's approval of the instructions as given cannot be deemed as extending to points of law that were not addressed in the jury instructions. Therefore, his failure to request the instructions at issue involves the failure to timely assert a right, which constitutes forfeiture, not waiver.

struck did not, at the time, have a lighted lamp or lantern reasonably visible to the drivers of vehicles approaching from the rear.

MCL 257.627(1) provides:

> An individual operating a vehicle on a highway shall operate that vehicle at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway and of any other condition existing at the time. An individual shall not operate a vehicle on a highway at a speed greater than that which will permit a stop within the assured, clear distance ahead. A violation of this subsection shall be known and may be referred to as a violation of the basic speed law or "VBSL".

Initially, we question the applicability of these statutes under the circumstances of this case, where the undisputed evidence showed that defendant backed his tractor onto the highway in front of the Baranskis' vehicle mere seconds before the collision. To the extent that the statutes apply, however, defendant cannot demonstrate that the trial court's failure to instruct the jury on their potential applicability affected the outcome of this case.

The principal issue for the jury to decide was whether defendant's operation of the tractor with an unlawful BAC was a factual and proximate cause of the Baranskis' deaths. The trial court instructed the jury that, in deciding proximate cause, "it is necessary for you to examine whether there was an intervening cause that superseded the [d]efendant's conduct such that the causal link between the [d]efendant's conduct and the victim's deaths was broken." The court instructed the jury regarding a superseding cause as follows:

> The standard by which to gauge whether an intervening cause supersedes, and thus severs the causal link is generally one of foreseeability. If victim's driving was reasonably foreseeable, then [d]efendant's conduct is considered a proximate cause of the deaths.

> If the intervening act, victims' operation of the vehicle, was not reasonably foreseeable, such as victims' operation was grossly negligent or intentional misconduct, then the causal link is severed, and the [d]efendant's conduct is not a proximate cause of the victims' deaths.

> While gross negligence or intentional misconduct by the victims will generally be considered a superseding cause, *ordinary negligence by the victims will not be regarded . . .as a superseding cause because ordinary negligence is reasonably foreseeable*.

> Gross negligence means more than carelessness. It means willfully disregarding the results to others that might follow from an act or failure to act. Gross negligence means that, one, an individual knew of the danger to himself or another, that is, he knew there was a situation that required him to take ordinary care to avoid injuring himself or another; and second, that the individual could have avoided injuring himself or another by using ordinary care, and that the individual failed to use ordinary care to prevent injuring himself or another when, to a

-9-

reasonable person, it must have been apparent that the result was likely to be serious injury. [Emphasis added.]

To the extent that the rear-end collision and the assured-clear-distance statutes applied, their only purpose would have been to create a rebuttable presumption that Ted was negligent. See *White v Taylor Distrib Co, Inc*, 482 Mich 136, 138 & n 3; 753 NW2d 591 (2008); *Zeni v Anderson*, 397 Mich 117, 134; 243 NW2d 270 (1976). For purposes of this case, however, that presumption, even if unrebutted, would not have been sufficient to establish a superseding cause to sever the causal link between defendant's conduct and the victims' deaths, given that a victim's ordinary negligence will not be regarded as a superseding cause. See *People v Feezel*, 486 Mich App 184, 195; 783 NW2d 67 (2010) ("Ordinary negligence is considered reasonably foreseeable, and it is thus not a superseding cause that would sever proximate causation."). Accordingly, defendant has not established plain error affecting substantial rights with respect to the trial court's failure to instruct the jury regarding these statutes.

Defendant also asserts, in a cursory one-sentence argument, that the trial court should have instructed the jury regarding Ted's duty to be alert to the potential of other vehicles, including slow moving agricultural vehicles in front of his vehicle on a rural road. Because defendant does not advance any meaningful argument or cite legal authority in support of this claim, we find that it has been abandoned. *People v Henry*, 315 Mich App 130, 148-149; 889 NW2d 1 (2016). Regardless, the trial court's general instructions on gross negligence were sufficient to apprise the jury of Ted's general duty of care and the type of conduct that could sever the causal link between defendant's conduct and the Baranskis' deaths. Instructions are not erroneous if, when viewed as a whole, "they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Blevins*, 314 Mich App at 353.

Affirmed.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick