## PEOPLE v DOBBEN

Docket No. 119010. Submitted November 6, 1990, at Grand Rapids.
    Decided February 19, 1991, at 9:40 A.M. Leave to appeal sought.
    Bartley J. Dobben was found guilty, but mentally ill, of two
    counts of first-degree murder, following a jury trial in the
    Muskegon Circuit Court, James M. Graves, Jr., J., and was
    sentenced to two concurrent terms of life imprisonment with-
    out parole. The defendant appealed, raising several issues,
    including the propriety of the court's denial of his motion to
    waive a jury trial, and the permitting by the court of the
    prosecution's expert witness to rely on the competency reports
    of two certified forensic examiners who conducted a court-or-
    dered criminal-responsibility examination of the defendant.

    The Court of Appeals *held:*

    1. The defendant's May 2, 1989, request to waive a jury trial
was governed by the June 1, 1988, amendment of MCL 763.3;
MSA 28.856, which prevents criminal defendants from unilater-
ally waiving a jury trial and instead requires both the prosecu-
tion's consent and the trial court's authorization. The defen-
dant was given the opportunity to exercise a waiver before the
amendment of the statute, but expressly chose not to. The court
properly denied the defendant's motion.

    2. The testimony of the prosecution's expert witness regard-
ing the defendant's criminal responsibility was not authorized
under MCL 330.2028(3); MSA 14.800(1028)(3) because the expert
was not one of the qualified examining clinicians who evaluated
the defendant's competency to stand trial pursuant to a court
order. In addition, his reliance on information gathered from
the previous court-ordered competency and criminal-responsi-
bility examinations in formulating his opinion was impermissi-
ble, and error requiring reversal.

    3. The court properly ruled that a friend of the defendant
who had not seen the defendant at the time of the offense, but

REFERENCES

Am Jur 2d, Criminal Law §§ 67, 68, 78, 79; Expert and Opinion
    Evidence §§ 187, 191; Jury.
Right of accused, in state criminal trial, to insist, over prosecutor's
    or court's objections, on trial without jury. 37 ALR4th 304.

had seen him earlier in the morning on the day of the offense, could not render an opinion regarding whether the defendant appeared insane when he committed the offense.

4. The court erroneously instructed the jury that it could consider evidence of the defendant's drug use two years before the offense as evidence of the origin of the defendant's mental illness. The reference to the evidence, even though not relevant to the ultimate issue of the defendant's criminal responsibility for his actions on the day of the offense, did not deny the defendant a fair trial.

5. The court erred in allowing the prosecutor to argue that the forensic examiners who testified for the defense were using the case as a means to enhance their own credibility in other cases.

Reversed and remanded.

1. CRIMINAL LAW — WAIVER OF JURY TRIAL.

Prospectively, from June 1, 1988, a criminal defendant may not unilaterally waive a trial by jury; rather, the defendant must seek the consent of the prosecutor and the approval of the trial court (1988 PA 89; MCL 763.3; MSA 28.856).

2. CRIMINAL LAW — WITNESSES — EXPERT WITNESSES.

An expert witness who did not participate in a court-ordered evaluation of a defendant's competency to stand trial may not rely on competency reports prepared pursuant to the order in rendering an opinion (MCL 330.2028[3]; MSA 14.800[1028][3]).

3. CRIMINAL LAW — TRIAL — WITNESSES — EXPERT WITNESSES.

A prosecutor may not attack the credibility of a defense expert witness without evidentiary support for the attack.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Tony Tague,* Prosecuting Attorney, and *Kevin A. Lynch,* Assistant Prosecuting Attorney, for the people.

*Terry J. Nolan,* and *Kohl, Secrest, Wardle, Lynch, Clark & Hampton, P.C.* (by *Konrad D. Kohl* and *Michael L. Updike*), of Counsel, for the defendant.

Before: NEFF, P.J., and MAHER and HOOD, JJ.

HOOD, J. Following a lengthy trial, a Muskegon

Circuit Court jury found defendant guilty, but mentally ill, of two counts of first-degree murder, MCL 750.316; MSA 28.548. He was sentenced to two concurrent terms of life imprisonment without parole. Defendant appeals as of right, raising five issues, one of which requires reversal.

I

The underlying facts of the charged crimes are not in dispute. On November 27, 1987, defendant placed his two young children in a foundry ladle at his workplace and ignited the burner beneath it. The boys died as a result of suffocation caused by the extreme heat.

The parties do not question that defendant was mentally ill when he committed the offense. The point of divergence was the extent of his mental illness. The only issue before the jury, therefore, was whether defendant was legally insane when he killed his children, and not merely mentally ill. In order to convince the jury in making this determination, a battle of the experts ensued concerning defendant's criminal responsibility. The testimony regarding defendant's mental condition was voluminous and does not require detailing in its entirety. Instead, the following is merely an illustration of the history of defendant's psyche.

A

In 1983, defendant married Susan Dobben, whom he had met at his church; this was Susan's second marriage, but his first. Shortly thereafter, defendant became "insanely jealous." By 1985, defendant's paranoia began to manifest itself in a series of bizarre behaviors.

Defendant began to believe that Susan was us-

ing her body language to signal other men, and thought that she was being unfaithful. When defendant learned that Susan was pregnant, he questioned whether it was his child. He thought that the registration numbers on trucks were telephone numbers, and he would often stop at phone booths to call them. He believed that people were trying to harm his family, and claimed that the mirrors in their motel room were being used by spies.

Defendant was convinced that his wife was having an affair with a member of the rock group Kiss. He believed that the band had a van parked in front of his house and was sending laser beams into his home. He claimed that the beams were going to bounce off the walls and kill his son Bartley Joel. Consequently, defendant lowered all the shades in the house, and covered pictures and other objects with baby diapers to prevent the laser beams from harming the family. Defendant also anointed the baby and the baby's entire room with olive oil, and would read scriptures virtually nonstop.

Defendant was eventually committed to the Kalamazoo Regional Psychiatric Hospital, where he was diagnosed as suffering from paranoid schizophrenia. When he was released two months later, defendant was provided with medication and ordered to undergo continuing treatment at a community mental health clinic.

During 1986, defendant remained extremely preoccupied with religion. He continued to believe that Susan was having extramarital affairs. Defendant also began to believe that babies were being ground up at the food company where Susan worked. Eventually he became preoccupied with the fate of missing children.

In early 1987, defendant became involved in a church headed by a preacher named Rood Vau-

ghan, who was described in the testimony as a "crazy preacher." Defendant's condition began to deteriorate as his relationship with Vaughan and Vaughan's church grew. Testimony indicated that, in time, Vaughan was able to convince defendant to stop taking his medication. Vaughan's influence exacerbated defendant's distrust of Susan, and led him to believe that his marriage was adulterous since she had never repented after her first marriage. Eventually, Vaughan and defendant began referring to Susan as "Jezebel" and his parents as "pagans and heathens."

Susan filed for a separation before Easter in 1987 in order to obtain an injunction to prevent defendant from taking the children to Vaughan's church all night. During the summer and early fall, defendant became obsessed with scripture reading and discussing religion. By October of 1987, defendant ceased his treatment at the mental health clinic.

The Dobbens reunited and were to spend Thanksgiving with defendant's parents. During the prior week, defendant became very stressful and unable to sleep. Shortly after midnight on Thanksgiving morning, defendant went to the home of Arthur Szot, a fellow employee. The two discussed religion, and defendant read scriptures, focusing in particular on God's trial of men by fire. Defendant did not leave Szot's house until nearly 4:00 A.M.

Defendant had apparently become convinced that the judgment day was coming and that his children were going to die because God would kill Jezebel's children. His obsession about the fate of missing children had so intensified that he believed the children were being burned at his foundry. He was convinced that a conspiracy had developed and informed Szot of his suspicions about the burnings. Fearing the fate of his chil-

dren at the hands of these conspirators, defendant decided he would kill his children at the foundry so he could be gentle with them and they would feel no pain. He decided on the foundry on the basis of his belief that no one would be suspicious about the children being burned there.

On their way to defendant's parents for Thanksgiving, defendant took a detour to the foundry. He claimed he needed to get his Bible, and then decided he wanted to show the boys where he worked. Defendant placed the children in the ladle and played with them as though it was a sandbox. After placing the lid on the ladle, he ignited the burner and returned to the entrance gate. Susan inquired where the children were, and defendant stated that he had put them in the furnace. He then asked the security guard to turn off the furnace. Defendant was arrested that day for the deaths of his two children.

B

Following his arrest on November 27, 1987, defendant was referred to the Center for Forensic Psychiatry for an evaluation of his competency to stand trial. On December 16, 1987, Moses Everett, Ph.D., determined that defendant was incompetent to stand trial. However, defendant was found competent on December 30, 1987. He was arraigned on the information on January 19, 1988, and a pretrial conference was held on February 3, 1988. In April, the parties agreed that defendant needed to be examined again for competency; later that month, he was found incompetent to stand trial. Eventually, on July 28, 1988, defendant was found competent to stand trial, provided he continued to receive medication.

In November 1988, defendant was ordered to

undergo a criminal responsibility examination. The prosecutor selected two certified forensic examiners, Lynn W. Blunt, M.D., and Harley W. Stock, Ph.D., to examine defendant. These examiners had conducted thousands of examinations, finding over ninety percent of the patients criminally responsible. In a lengthy and detailed report, Drs. Blunt and Stock found defendant to have been legally insane at the time he committed the offense. These examiners were not called to testify by the prosecution.

Instead, the prosecutor hired a New York psychiatrist to examine defendant for criminal responsibility. This psychiatrist, Dr. Abraham Halpern, examined defendant on April 17, 1989, for approximately 3½ hours. He also reviewed defendant's medical records and the reports of the previous examiners. Dr. Halpern concluded that, although defendant suffered from mental illness, he was not legally insane at the time of the incident.

C

On the first day of trial in May 1989, defendant moved to waive a jury trial pursuant to MCL 763.3; MSA 28.856, and proceed with a bench trial. However, on June 1, 1988, this statute had been amended to prevent criminal defendants from unilaterally waiving a jury trial; instead, both the prosecutor's consent and the trial court's authorization were required. The trial court denied the motion.

II

On appeal, defendant's first argument is that the trial court erred in denying his motion to waive a

jury trial and proceed with a bench trial. Defendant contends that, because he was incompetent to stand trial when MCL 763.3; MSA 28.856 was amended to require the prosecutor's consent, the amendment should not apply. We disagree.

We note initially that defendant had more than three months following his arraignment in January 1988 to waive a jury trial before he was deemed incompetent to stand trial a second time in mid-April of 1988. However, not only did he fail to exercise this waiver, defendant indicated at the pretrial conference that he did not want to waive a jury trial.

In *People v Bates,* 175 Mich App 490; 438 NW2d 298 (1989), this Court determined that MCL 763.3; MSA 28.856 is a procedural statute. The constitutional right, explained the Court, is to a trial by jury; a defendant does not have a right to a bench trial. *Id.* at 493. See also *People v Rodgers,* 180 Mich App 111; 446 NW2d 845 (1989). Therefore, the June 1, 1988, amendment did not destroy a vested or substantive right of defendant. *Bates, supra* at 493.

We agree with the reasoning in *Bates* and conclude that defendant's May 2, 1989, request to waive a jury trial was governed by the June 1, 1988, amendment. Defendant was thus required to seek the prosecutor's consent and the trial court's approval to waive a trial by jury. Defendant had the opportunity to exercise a waiver in early 1988, but expressly chose not to. Consequently, we need not reach the question whether defendant's subsequent incompetency when the amendment was enacted would toll its application.

III

Defendant's second argument is that the trial

court erred in permitting the prosecutor's expert witness to rely on the competency reports prepared pursuant to MCL 330.2028; MSA 14.800(1028). We have reviewed the record, and conclude that the introduction of Dr. Halpern's testimony was impermissible under the statute and constituted error requiring reversal.

MCL 330.2028(3); MSA 14.800(1028)(3) provides:

> The opinion concerning competency to stand trial derived from the examination may not be admitted as evidence for any purpose in the pending criminal proceedings, except on the issues to be determined in the hearings required or permitted by sections 1030 and 1040. The foregoing bar of testimony shall not be construed to prohibit the examining qualified clinician from presenting at other stages in the criminal proceedings opinions concerning criminal responsibility, disposition, or other issues if they were originally requested by the court and are available. Information gathered in the course of a prior examination that is of historical value to the examining qualified clinician may be utilized in the formulation of an opinion in any subsequent court ordered evaluation.

This provision replaced MCL 767.27a; MSA 28.966(11), which prohibited the admission of diagnostic reports and recommendations generated by a competency examination at subsequent stages in a pending criminal prosecution. In essence, the prior statute prohibited a competency examiner from rendering opinions regarding other related issues at subsequent proceedings, since any opinion would inevitably be based on information obtained from the competency examination.

However, when the first two sentences of MCL 330.2028(3); MSA 14.800(1028)(3) are read, it is clear that the Legislature intended to depart from

this harsh prohibition. Instead, a qualified examining clinician who participates in a competency evaluation is now permitted to render opinions regarding other related issues, e.g., criminal responsibility, at subsequent stages in the criminal proceeding, if such has been requested by the court. Dr. Halpern was not, however, one of the qualified examining clinicians who evaluated defendant's competency to stand trial. Therefore, we conclude that his testimony was not authorized under this portion of the statute.

We also conclude that Dr. Halpern's testimony was not permitted under the final sentence of subsection (3), which provides that "[i]nformation gathered in the course of a prior examination that is of historical value to the examining qualified clinician may be utilized in the formulation of an opinion in any subsequent *court ordered* evaluation." (Emphasis added.) There is no dispute that Dr. Halpern's examination of defendant was not conducted pursuant to court order. His reliance on information gathered from previous competency and criminal responsibility examinations in formulating his opinion that defendant was not legally insane was impermissible. Our review of his testimony reveals an extensive reliance on and recitation of various conclusions of prior examiners regarding defendant's then-existing state of mind.

We hold, therefore, that the introduction of this evidence, in violation of the statute, was error, and we reverse on this ground.[1] Our conclusion does not, however, preclude the prosecutor from rebutting the insanity defense with the testimony of an expert whose opinion has not been based on the

---

[1] Our resolution of this issue renders defendant's other issue relating to Dr. Halpern's testimony moot. Therefore, we decline to address whether it was error for the trial court to permit the testimony because Halpern submitted a report which was not in compliance with MCL 768.20a(6); MSA 28.1043(1)(6).

information gathered from previous examinations conducted during the pendency of the criminal proceedings unless the subsequent evaluation is conducted pursuant to a court order.

IV

Having determined that defendant is entitled to a new trial, we will only briefly address his remaining issues which may be relevant to the proceedings on remand.

A

Defendant claims that a series of evidentiary rulings denied him a fair trial. We disagree. But, we will briefly address each claim.

Defendant points, first, to the trial court's ruling that Arthur Szot, a coemployee and friend of defendant, could not render an opinion regarding his sanity. We agree with the trial court that Szot's opinion regarding defendant's sanity should be limited to the time that he was last able to observe defendant, i.e., when defendant left Szot's house at 4:00 A.M. on Thanksgiving morning. Since Szot did not see defendant at the time of the offense, he cannot render an opinion regarding whether defendant appeared to be insane when he committed the offense.

B

Defendant has also addressed the prosecutor's repeated reference to his alleged drug use. Specifically, the prosecutor focused on alleged drug use which may have been a triggering factor instigating his mental illness and leading to his commitment in 1985. We find that these references,

though not relevant, did not deny defendant a fair trial, and we decline to reverse on this ground.

There was no dispute that defendant was mentally ill when he placed his children in the foundry ladle, or that he had been ill for some time. Rather, the only issue before the jury was whether defendant was legally insane, and thus not criminally responsible for his actions, or merely mentally ill. Therefore, we fail to see how the origin of defendant's mental illness, which had been diagnosed years before the offense, had any relevance to the ultimate issue of his criminal responsibility for his actions on that Thanksgiving Day.

Consequently, we find that the trial court's instruction, which allowed the jury to consider the evidence of drug use in deciding whether defendant was mentally ill in 1985, was erroneous. The jury was not faced with the issue whether defendant was mentally ill in 1985, therefore this instruction should not have been given. The sole issue before the jury was whether the defendant was legally insane on November 27, 1987.

C

Defendant has also objected to the prosecutor's closing argument that the forensic examiners who testified for defendant were using this case as a means to enhance their own credibility in other cases. We do not reverse on this ground; however, we do believe it was error to permit the argument.

For a prosecutor to attack the credibility of a defense expert witness, there must be supporting evidence. *People v Chatfield,* 170 Mich App 831, 834; 428 NW2d 788 (1988). The only evidence arguably supporting this attack was the testimony that over ninety percent of the people examined at

the forensic center are found to be criminally responsible. However, we do not believe that the prosecutor's inference from this evidence was reasonable. See *People v Tyson,* 423 Mich 357, 373-376; 377 NW2d 738 (1985). We believe that this line of argument was particularly inappropriate, given the trial court's prior ruling prohibiting defendant from informing the jury that the prosecution had selected these two clinicians to examine defendant before it had solicited Dr. Halpern.

v

Defendant's convictions are reversed, and the case is remanded for a new trial.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.