*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DELILAH SHERWOOD EVANS,

Defendant-Appellant.

FOR PUBLICATION
December 17, 2020
9:00 a.m.

No. 343544
Macomb Circuit Court
LC No. 2017-001820-FC

Before: SWARTZLE, P.J., and BECKERING and GLEICHER, JJ.

GLEICHER, J.

Delilah Evans stood trial for the murder of her mother, Sonia Riang. Evans advanced an insanity defense and two expert witnesses testified on her behalf. The prosecution had no expert. To rebut the defense experts' testimony, the prosecuting attorney relied on cross-examination. The jury found Evans guilty but mentally ill and convicted her of first-degree premeditated murder, MCL 750.316(1)(a).

Cross-examination is a powerful legal engine for discovering the truth. But when it repeatedly transgresses well-established boundaries, an improper cross-examination denies a defendant a fair trial. The prosecutor's interrogation of one of the experts in this case, Dr. Meghan Rowland, crossed the line on multiple occasions. The prosecutor likened Dr. Rowland to a cartoon character, accused her of writing her report in crayon, baselessly accused her of withholding evidence, misrepresented her testimony, and badgered her relentlessly. Counsel's performance denied Evans a fair trial.

Evans's additional challenges to her conviction lack merit. Based on the prosecutor's misconduct, however, we must vacate Evans's conviction and sentence and remand for a new trial.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Evans, age 17, stabbed her mother, Sonia Riang, 124 times with a kitchen knife. Evans then showered, used bleach to clean blood from surfaces, placed a blanket over Riang's body, and left the apartment where she and Riang lived. At a nearby 7-Eleven, Evans asked the store clerk to call the police. Evans made several bizarre statements to the arresting officers, including that

-1-

she had just been held at gunpoint by a different officer who forced her into an act of prostitution, and that she had dropped out of high school because her teachers, too, had forced her into prostitution.

During a custodial interview, Evans admitted to killing Riang, but intermittently devolved into delusional rambling. Evans claimed that Riang was not actually her mother, but a witch named Helen who had two heads and had kidnapped Evans when she was a child. Riang cast spells, Evans reported, and could make noodles "boil and pop." Her father was Satan, Evans declared, and had participated in the kidnapping. Evans asserted that she decided to kill Riang because she was a witch (alternatively, a dragon) and had threatened to kill Evans.

Evans admitted that she had alternatively stabbed Riang's back and chest, smothered her with a pillow, and when these efforts did not bring about Riang's death, stabbed her neck. Gnats flew out of Riang's stomach during the attack, Evans maintained. According to the detective who conducted the interview, Evans's description included "rants" about dark angels and voices in her head. She claimed that she had turned herself in because she was "1000 years old." Evans was placed in a single cell in the mental health unit of the Macomb County jail.

This was not the first time that Evans had displayed evidence of mental illness. Two weeks before the murder, Riang brought Evans to a local hospital for a psychiatric evaluation because she was "acting crazy." Evans was discharged after a brief evaluation and was not seen by a psychiatrist.[1] When she was lodged in the Macomb County jail, however, a jail physician placed Evans on suicide preventions and prescribed an antipsychotic medication and an anti-anxiety drug. According to the jail's Director of Mental Health, Evans was experiencing "actively psychotic-delusions" and appeared to be responding to "internal stimuli." Other jail notes referenced jail staff members' suspicion that Evans was experiencing hallucinations.

Dr. Rowland, the first expert called by the defense, is employed by Center for Forensic Psychiatry. The Center for Forensic Psychiatry is an independent branch of the state government. *People v Hayes*, 421 Mich 271, 288; 364 NW2d 635 (1984). Dr. Rowland conducted her assessment pursuant to a statute requiring that a defendant asserting an insanity defense undergo an examination by a Center professional.[2] She interviewed Evans for more than six hours, both to assess her competency to stand trial and to determine whether she was criminally responsible. Dr. Rowland concluded that Evans met the criteria for competency but was legally insane when she murdered her mother.

At the time of the interviews, Evans was medicated. She was able to describe to Dr. Rowland what had occurred before, during, and after the murder. She admitted to hiding a knife

---

[1] Dr. Rowland's report indicates that Evans was "petitioned for mental health evaluation" two weeks before the murder after attempting to stab her brother and "stating she was hearing voices." She was released because the family did not file formal charges.

[2] "Upon receipt of a notice of an intention to assert the defense of insanity, a court shall order the defendant to undergo an examination relating to his or her claim of insanity by personnel of the center for forensic psychiatry or by other qualified personnel[.]" MCL 768.20a(2).

or knives before and after killing Riang, making an effort to clean the bloody scene, leaving the premises, and putting a cell phone in the snow. The prosecutor relied on these facts to assert that the murder was premeditated and not the product of an insane mind.

Dr. Rowland's 26-page, single-spaced report exhaustively described the records she reviewed and the conversations she had with Evans about the murder and events that preceded and followed it. The report included details consistent with Evans having planned the murder. For example, Evans told Dr. Rowland that on the day she killed Riang, Evans was "playing with knives and . . . thought about stabbing [her] mother." She retrieved several knives and hid one so that her mother could not see what she was doing. Evans described being angry at her mother, stabbing her repeatedly, and feeling guilt afterwards. The report noted that the results of a personality assessment Rowland administered were "non-valid" as Evans "appeared to answer questions in an attempt to portray herself in a negative manner."

The report is also replete with descriptions of Evans's delusions, including that she (Evans) had "angel wings because my dad suffocated me . . . then I suffocated myself with a pillow when I was watching Aaliyah sing." Her brother was on "Facetime Live," Evans reported, and she (Evans) talked to "Jackie Chan" on Facetime "because he pays for it." She denied making any of the statements about "dark angels" recorded in her interview with the police, yet also quoted her mother as saying "she was the Statue of Liberty" and expressing that her mother had "a dragon head" and was "a witch." When she stabbed her mother in the stomach, Evans recalled, she "was expecting worms to fall out." Evans acknowledged awareness that she had "murdered [her] mother in cold blood," and hid a knife in a towel because she knew the police were going to show up.

Dr. Rowland concluded that during the murder, Evans "was experiencing a substantial disorder of thought and mood that significantly impaired her judgment, behavior, capacity to recognize reality and ability to cope with the ordinary demands of life surrounding the time of the alleged offences." Specifically, Dr. Rowland found that Evans "exhibited tangential and disorganized thought, loose associations with reality, delusional thought content and reported auditory hallucinations that, in this evaluator's opinion, significantly impaired her ability to recognize reality at the time of the alleged offenses." Dr. Rowland premised her conclusion that Evans met the legal definition of insanity on a single and specific prong of the statutory test: that as a result of mental illness, Evans "lacked the substantial capacity to appreciate the nature and quality of" the situation. Dr. Rowland stressed in her report that Evans likely *did* have "the capacity to conform her conduct to the requirements of the law (i.e., the ability to assess and choose alternative behaviors)" when she committed the crime. Nevertheless, because Evans lacked the ability to appreciate the nature and quality of her acts, Dr. Rowland concluded that Evans met the criteria for legal insanity.[3]

---

[3] Insanity is an affirmative defense requiring proof that, "as a result of mental illness," the defendant "lack[ed] substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct *or* to conform his or her conduct to the requirements of the law." MCL 768.21a(1) (emphasis added). Dr. Rowland relied solely on the first alternative—that Evans was unable to "appreciate" the wrongfulness of her actions.

Stephen Miller, Ph.D., was retained by Evans's counsel. He, too, opined that Evans was legally insane when she killed Riang. In Dr. Miller's view, Evans suffered from a "schizoaffective disorder, bipolar type," and her disease manifested in paranoia and mood swings. He opined that Evans actions before, during, and after the killing of Riang "were acts of a deeply and fundamentally declining delusional and irrational motivation on [defendant's] part."

In lieu of calling an expert witness, the prosecutor sought to undermine the opinions of the defense experts through cross-examination. The prosecutor's impeachment primarily relied on three facts: the experts admitted that their opinions regarding legal insanity were "subjective" and that other experts and even laypersons could disagree; Evans's behavior before, during, and after the killing suggested logical and coherent thinking; and Evans had been deliberately deceitful by exaggerating her negative symptoms when completing the written psychological test.

The jury found defendant guilty but mentally ill of first-degree premeditated murder. The trial court conducted a sentencing hearing pursuant to *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), to determine whether Evans should be sentenced to life imprisonment without parole. After two short days of testimony and argument on that issue, the trial court imposed a life-without-parole sentence.

With her brief on appeal, Evans moved this Court to remand the case for a *Ginther*[4] hearing regarding the effectiveness of her counsel during the *Miller* and sentencing hearings. We granted that motion, remanded the case for the appropriate hearings, and retained jurisdiction.[5] During the remand proceedings, the trial court found defense counsel ineffective during the *Miller* hearing and ordered a new one, to be followed by a resentencing hearing. The parties have stipulated to stay resentencing proceedings pending the resolution of the issues presented in this appeal.

## II. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE

Evans first contends that insufficient evidence supported that she was not legally insane at the time of the murder. Alternatively, she asserts that the jury's verdict of guilty but mentally ill was against the great weight of the evidence. We must reject these arguments because the jury was entitled to disbelieve the expert witnesses, regardless of the strength of their testimony, and some evidence of record supported that Evans was legally sane at the time of the killing.

We review de novo the question of evidentiary sufficiency, *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016), viewing "the evidence in the light most favorable to the prosecutor" to "determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). This standard of review is deferential. We must draw all reasonable inferences and make credibility determinations in favor of the verdict. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015).

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] *People v Evans*, unpublished order of the Court of Appeals, entered October 30, 2019 (Docket No. 343544).

Evans posits that no reasonable juror could have concluded that she was legally sane when she murdered her mother because the prosecutor failed to introduce any expert testimony to contradict the defense experts. This argument misses the mark in two respects. First, Evans bore the burden of proving her insanity defense by a preponderance of the evidence. MCL 768.21a(3). Because the law presumes that a defendant is sane, *People v Ramsey*, 422 Mich 500, 545; 375 NW2d 297 (1985), Evans was required to come forward with evidence substantiating that more likely than not she was legally insane when committed the crime. The prosecutor was not required to present any evidence on this score. See *People v Mette*, 243 Mich App 318, 330; 621 NW2d 713 (2000) ("The prosecution is not shouldered with the burden of proving the failure of an affirmative defense."). And "if a defendant produces sufficient evidence of the elements of [an affirmative] defense, then the question whether the defendant has asserted a valid defense is for the jury to decide." *People v Kolanek*, 491 Mich 382, 411-412; 817 NW2d 528 (2012). Thus, the prosecution's failure to put forward expert testimony did not render the evidence supporting Evans's sanity insufficient as a matter of law.

Second, a jury is entitled to disbelieve an expert witness's testimony, even though the testimony is unrebutted or uncontradicted by other expert testimony. *Estate of Taylor v Univ Physician Group*, 329 Mich App 268, 283; 941 NW2d 672 (2019). This legal principle rests on a long-standing foundation. In *Woodin v Durfee*, 46 Mich 424, 427; 9 NW 457 (1881), Justice COOLEY explained that despite the absence of any conflicting evidence, the jury "may disbelieve the most positive evidence, even when it stands uncontradicted; and the judge cannot take from them their right of judgment." See also *People v Kanaan*, 278 Mich App 594, 620; 751 NW2d 57 (2008) (quotation marks and citation omitted) ("[A] trier of fact is not bound to accept the opinion of an expert."). The absence of a prosecution expert did not compel the jury to accept Evans's experts' testimony as true.

Constitutionally sufficient evidence of guilt exists where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (quotation marks and citation omitted). A jury could have found Evans guilty of first-degree murder if it determined that, beyond a reasonable doubt, she had committed a "willful, deliberate, and premeditated killing." MCL 750.316(1)(a). Evans does not challenge the sufficiency of the evidence related to any of these elements. And viewed in the light most favorable to the prosecution, Evans's statements combined with the physical evidence could support that she deliberately killed Riang. Evans admitted that she hid a knife in preparation for attacking her mother and stabbed her repeatedly before administering the lethal strike. Her description of the crime allowed for time to "take a second look." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citation omitted). Assuming that the jury found the experts incredible, sufficient evidence supported the verdict.

Evans alternatively argues that the jury's verdict contravened the great weight of the evidence. "A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Solloway*, 316 Mich App 174, 182-183; 891 NW2d 255 (2016) (quotation marks and citation omitted). "Generally, a verdict is against the great weight of the evidence only when it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Morris*, 314 Mich App 399, 414; 886 NW2d 910 (2016) (quotation marks and citation omitted).

Evans's great weight argument has more merit than her sufficiency claim, but nevertheless falls short. As discussed below, the prosecutor's cross-examination of Dr. Rowland was misleading and prejudicial. At its heart, however, Evans's great weight argument is about credibility. Evans insists that no reasonable juror could have concluded that she was sane in light of the unrebutted expert testimony. As we have explained, the jury was not compelled to believe the experts. Absent their testimony, more than a shred of evidence of record supported that Evans planned the crime and attempted to conceal it afterwards. Accordingly, reasonable jurors could naturally and fairly come to different conclusions regarding whether Evans was legally insane and her great weight argument must fail.

## III. PROSECUTORIAL MISCONDUCT

Evans next argues that the prosecutor committed misconduct requiring reversal by engaging in an improper cross-examination of Dr. Rowland. Our review confirms that much of the prosecutor's cross-examination of Dr. Rowland was irrelevant, demeaning, and unfairly prejudicial. The pervasiveness of the improper questioning and its inflammatory nature convinces us that prosecutorial misconduct denied Evans a fair trial.

In cases alleging prosecutorial misconduct, issues are "preserved by contemporaneous objections and requests for curative instructions . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). Although Evans cites two objections by defense counsel during the prosecutor's cross-examination of Rowland, those objections did not state arguments regarding the issues now raised on appeal. Because "an objection on one ground is insufficient to preserve an appellate argument based on a different ground," Evans's claims of prosecutorial misconduct are unpreserved. *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011). Our review, therefore, is for plain error. *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014).

"To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*.[6]

---

[6] Given our resolution of Evans's arguments regarding the cross-examination of Dr. Rowland, we need not address Evans's alternative claims of prosecutorial misconduct. Whether defense counsel was ineffective for failing to properly object to the prosecutorial misconduct has also been rendered moot. We note that reversal and remand for a new trial also could have been premised on the claim of ineffective assistance of counsel for failing to object to the prosecution's disparagement of Dr. Rowland, for many of the same reasons that the prosecutorial misconduct warrants reversal under the plain-error doctrine.

A. GUIDING LEGAL PRINCIPLES

A prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935). During a criminal trial, prosecutors "serve truth and justice first. The job isn't just to win, but to win fairly, staying well within the rules." *United States v Kojayan*, 8 F3d 1315, 1323 (CA 9, 1993). The rules at issue here concern cross-examination.

In *Berger*, the United States Supreme Court reversed a conviction on the ground of prosecutorial misconduct stemming from both the prosecutor's argument and the conduct of his examination of witnesses. The Supreme Court listed the ways in which the prosecutor had violated his ethical obligations during cross-examination. The prosecutorial misconduct in this case mirrors this compilation:

> [The prosecutor] was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner. [*Berger*, 295 US at 84.]

"Vigorous and searching cross-examination is a powerful instrument for the ascertainment of truth." *D'Aquino v United States*, 192 F2d 338, 369 (CA 9, 1951). Cross-examination is a critical method of testing a witness's credibility and exposing weakness in a witness's account. And it is appropriate that cross-examiners be afforded wide latitude to do their job.

> One of the elementary principles of cross-examination is that the party having the right to cross-examine has a right to draw out from the witness and lay before the jury anything tending or which may tend to contradict, weaken, modify, or explain the testimony of the witness on direct examination or which tends or may tend to elucidate the testimony or affect the credibility of the witness. [*People v Dellabonda*, 265 Mich 486, 499-500; 251 NW 594 (1933).]

Effective and probing cross-examination of expert witnesses is particularly important in criminal cases when expert testimony plays a pivotal role. "But invective, ridicule, injection of [the prosecutor's] belief, and innuendoes [are] not permissible . . . and [are] unfair to the experts and prejudicial to defendant." *People v Cowles*, 246 Mich 429, 432-433; 224 NW 387 (1929).[7] In *People v Tyson*, 423 Mich 357, 376; 377 NW2d 738 (1985), our Supreme Court reversed a

---

[7] *Cowles*, like the other Michigan cases we discuss here, specifically addressed the prosecutor's closing argument and not cross-examination. As discussed in *Berger*, the ethical and legal principles governing argument are consistent with those applicable to cross-examination.

defendant's conviction because during closing argument, a prosecutor engaged in a "personal attack on the defendant's expert [that] was intended to, and did, distract the jury from the real issues," including "whether or not defendant was insane." The Supreme Court highlighted that in such cases the ultimate verdict is usually "decided on the basis of which expert the jury chose to believe," and thus, "it is especially important to protect against prosecutorial misconduct designed to impugn the credibility of the defendant's expert witness." *Id*.

This Court has characterized *Tyson* as reaffirming "the long-standing rule that a highly prejudicial attack of a defendant's expert witness without support on the record would require reversal." *People v Miller*, 182 Mich App 482, 486; 453 NW2d 269 (1990). In that case, we observed, the record contained "argument that was filled with innuendos, insults and ridicule." *Id*. And in *People v Williams*, 162 Mich App 542, 549; 414 NW2d 139 (1987), we described *Tyson* as involving arguments that were "clearly injected in an attempt to impeach defendant's claim of insanity." More recently we reiterated that, "in a case that turns largely on conflicting expert testimony, a prosecutor must take special steps to avoid misconduct designed to impugn the integrity of the defendant's experts." *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008). We stressed that "[w]hen the expert testimony is relevant to a substantial, disputed issue in the case, and each expert's testimony is otherwise competent, resolution of the conflict between the experts must be left solely to the finder of fact." *Id*.

Traditionally, cross-examination proceeds in a question and answer format. Questions are framed in understandable language. Skilled questioners do not engage in lengthy narrative discourses preceding an inquiry and do not pick fights with witnesses. And a cross-examination must focus on relevant evidence. See MRE 611(c). As the excerpts reproduced below elucidate, the prosecutor in this case adhered to none of these conventions. This was a tragic case, to be sure. But that the murder was gruesome does not justify questioning intended to ridicule or debase an expert witness, particularly an expert employed by an independent branch of the state government who performed her evaluation pursuant to her obligations as a state employee. See *People v Hayes*, 421 Mich 271, 288; 364 NW2d 635 (1984).

## B. SPECIFIC EXAMPLES OF MISCONDUCT

Dr. Rowland testified on direct examination that Evans was mentally ill (a fact that the prosecution did not challenge) and opined that at the time she committed the crime, Evans "lacked the substantial capacity to appreciate the nature and quality or the wrongfulness of her conduct." This testimony corresponded precisely to the language of MCL 768.21a(1), which permits a jury to find a defendant legally insane based on *either* a lack of "substantial capacity to appreciate the nature and quality or the wrongfulness of his or her conduct," *or* a lack of the "substantial capacity . . . to conform his or her conduct to the requirements of the law." Dr. Rowland emphasized that in reaching her conclusion she focused on Evans's mental condition at the time Evans committed the crime, repeatedly referring to the statutory provision that to establish an insanity defense, a defendant need only prove that he was legally insane at the time he "committed the acts constituting the offense." MCL 768.21a(1).

The following excerpts illustrating the prosecutor's infringements of his ethical and legal obligations fall into several categories. First, the prosecutor repeatedly and gratuitously disparaged Dr. Rowland's qualifications and her intelligence. No evidence supported the prosecutor's snide

-8-

and derisive comments maligning Dr. Rowland's education and her professional competence. Second, the prosecutor inaccurately characterized Dr. Rowland's opinions in a sarcastic, mocking, and inaccurate manner. This tactic was designed to generate the jury's scorn rather than to shed light on the issues presented by the evidence. Third, the prosecutor repeatedly accused Dr. Rowland in a badgering fashion of deliberately ignoring or withholding evidence from the jury and accused her of being unable to distinguish "right from wrong." No evidence underlay these attacks. We turn to the transcript excerpts illustrating the prosecutor's misconduct.

At the outset of the cross-examination, Dr. Rowland attempted to reiterate that she premised her ultimate opinion on Evans's sanity at the time of the murder, consistent with the statute. The prosecutor asked this question:

> So you're saying that immediately - -
>
> You are only going to hold her responsible or not responsible for the period of the murder and going to ignore everything she did afterwards?
>
> Because, see, the law says for me to prove premeditation, I can show before, during and after. And they can use everything she did after in determining whether or not there was a plan.
>
> What you are saying is: No, no, no. I don't have to. All I have to do is show right after the murder, and *I can ignore everything else after that. So that my opinion looks rational.* [Emphasis added.]

Defense counsel interjected, "Was that a question?" The prosecutor responded, "Yes. I don't have to raise my voice in a raised inflection . . . to make it appear to be [a] question." The witness asked that the "question" be restated. The prosecutor then launched into an argument, tacking on a question at the end:

> The law says this jury can look at everything before, during, and after to make a determination as to whether or not there was premeditation. *You are saying I don't have to do that.* All I have to go [sic] get it before. I can't tell you how long before, *I don't want to*. And during and I can stop with the last stab wound. It is over. I don't have to explain away everything afterwards. Is that what you are telling this jury. [Emphasis added.]

Dr. Rowland reiterated that she was "following the statute to form my opinion." The prosecutor returned to this theme—that Dr. Rowland was covering up or deliberately disregarding facts—again and again, despite Dr. Rowland's efforts to direct him to the statutory language.

In another exchange, the prosecutor again focused on Dr. Rowland's decision to limit her opinion to the time the alleged offense occurred instead of Evans's subsequent attempts to hide the knife and a cell phone. The following colloquy occurred:

> *Q. Isn't there something in you at all that recognizes that there is a difference between right and wrong when you attempt to cover up a crime?* When you realize what are the consequences of what you did is jail.

*A.* Again, that would not be for me to speak to.

*Q.* Isn't it? *You have the PhD. You have all the training. You have done hundreds of these things. I mean, explain it to me, Lucy, I don't get it.*

*A.* Again, it is not for me to be able to say anything about her intent at the time. I'm looking at statute and being able to explain my opinion.

*Q.* But you must have an opinion. You have 14 people here. We don't have your education. You must have an opinion one way or the other.

Okay. Unless you're going to tell me: *I'm not going to give you my opinion of anything except what is in my report, because they don't need to hear it or it's going to be negative to what I'm attempting to testify to.*

*So I'm going to withhold that information from this jury.* [Emphasis added.]

Here, the prosecutor not only accused Dr. Rowland of withholding information; the prosecutor flagrantly disparaged Dr. Rowland's qualifications and abilities. Calling Dr. Rowland "Lucy" was not an accident or a slip of the tongue. As most adults know, Lucy was a character in the Peanuts comic strip who, in a well-known series of comics, was portrayed as a bumbling and unqualified psychiatrist dispensing useless advice from a lemonade booth. See <https://peanuts.fandom.com/wiki/Lucy%27s_psychiatry_booth> (accessed November 24, 2020). Referring to Dr. Rowland as "Lucy" was misconduct, both prosecutorial and ethical.[8] Further, this excerpt illustrates another unsubstantiated insinuation that Dr. Rowland purposefully ignored information because it might "be negative to what [she was] attempting to testify to." Without evidence, the prosecutor again asserted that Dr. Rowland made the conscious effort "to withhold that information from this jury." These allegations did not advance the jury's understanding of the evidence. Nor were they crafted to call Dr. Rowland's credibility into question. Rather, the prosecutor's statements groundlessly denigrated Dr. Rowland's professional abilities and humiliated her.

Shortly after that exchange, Dr. Rowland read aloud from her report's summary in another effort to explain her conclusions. The prosecutor engaged her in a hybrid form of testimony and argument, as follows:

*Q.* She is mentally ill as the day is long. What I'm saying is additional information between mental illness, the voices, the delusions, the gnats coming out

---

[8] The Michigan Rules of Professional Conduct require that lawyers "shall treat with courtesy and respect all persons in volved in the legal process," and shall "take particular care to avoid treating such a person discourteously or disrespectfully because of the person's race, gender, or other protected personal characteristic." MRPC 6.5(a). The prosecutor's "Lucy" comment was, in our view, gender-based and utterly inappropriate; we cannot fathom that the same comment would have been made to a male psychologist.

-10-

of the stomach versus her ability to understand right from wrong. Okay. That is the point that I'm arguing.

*And with the point I'm arguing with this jury, they get to look at everything greater than what you say you're limited to.*

*Yet you throw all of that in there as sort of afterthought.* So, well, when defense counsel gets this report, I want him to see that I recognize all of it, but I'm not considering it because you go right from saying everything she did that was the difference between right and wrong, into this, yeah, but it is my opinion of insanity without giving a foundation, without giving a psychological reason, without telling me under what condition she is suffering, what it was that caused her to do all of those things and ignore the rest.

That is what I want to understand. Where is it in your paragraph, the summary, the psychological rationalization, justification to ignore everything you wrote right above it[?]

*A.* The last paragraph in this entire report just summarize [sic] my findings. The rest of the 26 page[s] in this report details carefully out all of the notes, all of the records, everything I reviewed how I perceived her when meeting with her as well as talked about statute, how I applied all of my information that I found from statute, my clinical training and came to my opinion.

*Q.* So basically what you are saying is she is disorganized up to the point of murder, and organized afterwards, and that *you spent 24 and a half pages talking about what you did and what you saw and blah, blah, blah, but I acknowledge these other things that show the difference between right and wrong, but I'm not going to - -*

*I'm not going to consider them.* [Emphasis added.]

The prosecutor's lengthy recitation of his view of the evidence was not a question; it was an unnecessary prop for the criticism of Dr. Rowland he eventually leveled. Further, the prosecutor again alleged, contrary to the testimony, that Dr. Rowland purposely disregarded evidence to bolster her opinion.

The prosecutor turned his attention to evidence that Evans planned to kill Riang by hiding knives. Once again, the prosecutor accused Dr. Rowland of ignoring that part of the evidence so that her opinion of legal insanity was more palatable for the jury, commented negatively on her education,[9] and mocked her testimony:

*Q.* You're not here to determine intent or whether there was premeditation. You're here to determine whether or not she was able to conform her ability. She

---

[9] Although the prosecutor referred to Dr. Rowland's degree as a Ph.D., she actually has a Psy.D.

-11-

says she wants to stab her mother. She takes a knife. She hides it in two separate locations, including location in her mother's bedroom where she can isolate her mother.

That is not an organized thought that you can't, you can't read into that just those behaviors.

None of us have PhDs here. *You got the PhD. You're telling me you can't see that.*

*A.* Sorry, I'm just reacquainting. - -

What she has told me during my evaluation is that she got it out of [another] room and was hiding it in the trash can as well as under the pillow. So that [Riang] wouldn't see what she was doing with the knife. That is what she stated.

*Q.* Right there "so [Riang] couldn't see what I was doing with the knife".

Why do you think morally she said that? Why do you think legally she said that[?]

*A.* At the time she didn't want her mother to see what she was doing with the knife.

*Q.* Okay. *Are we just ignoring the fact here, or you ignoring the fact she wants to kill [Riang]?*

She told you she is thinking about stabbing her mother and she made three actions to do it and *that means nothing to you. You are just going to keep hiding behind the fact:* Well, no, no, no. We're playing fair. I'm not going to read into what those behaviors are. [Emphasis added.]

The prosecutor's effort to insult Dr. Rowland's intelligence did not end there. During the prosecutor's questioning regarding Dr. Rowland's insistence that the events after Riang's death were not determinative of whether Evans was sane during the killing itself, the following ensued:

*Q.* Right up into the last stab, immediately after that, all the, all the organized stuff you are saying is not mental illness. She is not mentally ill for the next two hours while she is cleaning up?

*A.* I'm not opining on that.

*Q.* Okay. Then what are you opining on?

*A.* The time of the alleged offenses.

*Q.* But I don't see how you separate the alleged offense from the moment. I don't see how it gets shut on and off like a faucet. Her behavior, her emotions,

-12-

her understanding. I mean, because part of what I'm saying if you are saying to me she is insane, I guess, *my culture, my stereotypical, my non-informed opinion is there is this significant indifference to it.*

*And then all of a sudden, I go into hyper clean, cover up Judo-Christian [sic] and I understand what guilt mode is and then I did wrong.*

*I don't understand the position. You can so easily sit there and say: A and B, and C, the queen ain't me.*

*A. Can you clarify that? If there is a question.*

*Q. Well, you want to play semantics? You understand my question.*

My question is how can you say all of this behavior, all of this behavior and this behavior means nothing because the intellectual capacity stops. The mental illness stopped at that point. *You need me to write it out in Crayon for you[?]* [Emphasis added.]

Aside from offering his own opinions and his own "values," the prosecutor accused Dr. Rowland of "play[ing] semantics" and offered to "write it out in Crayon" so she would better understand his views. The impropriety of this performance requires little elaboration. The gratuitous insults hurled at Dr. Rowland by the prosecutor dripped with hostility, ridicule, and aggression. They violated not only the prosecutor's obligations as a prosecutor, but as an attorney. See MRPC 4.4 ("In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person period.").

In a similar vein, the prosecution implied that Dr. Rowland was being purposefully dense when she refused to opine why Evans took a shower after killing Riang. Dr. Rowland stated that she was aware that Evans had showered, but Evans never explained why. In response the prosecutor stated, "Wait, wait, wait, wait, wait, wait. You have a PhD?" At another point Dr. Rowland explained that Evans's moments of lucidity did not change her opinion that Evans was legally insane when she killed Riang. The prosecutor responded with the following diatribe:

Excuse me, for not having your education. Okay. But it seems to me that if I'm in a full blown episode and I murder my mother because I am insane, then one of three things are going to happen after I murder my mother.

I'm going to still continue with the indifference that I murdered my mother.

I'm going to realize it was, like, a heat of passion situation: Oh, cripe, it was wrong. I better call for medical assistance. I better get help.

Or I'm going to just go ahead and cover it up and clean it all up.

I don't understand. Those would seem to be the most reasonable reaction to something when I'm in a full blown mental state. Why isn't the indifference versus and absolutely hours long effort to clean up and hide items from the crime[?]

In that "question," the prosecutor began by again making a snide remark about Dr. Rowland's education before supplying his own version of how an insane person should or could react to a crime. By injecting his own irrelevant beliefs into the case, the prosecutor violated the letter and spirit of *Tyson* and *Cowles*.

At another point during cross-examination, the prosecutor asked about Evans having changed tactics in her attempts to kill Riang:

*Q*. She told you that she stabbed her mother in the lungs, hoping she would die because by stabbing in the lungs she hoped [Riang] would run out of air. That didn't work. Is that not coherent thinking?

*A*. That is one piece of coherent thinking.

*Q*. I know you're only using - -

How many pieces do we have for you to throw out my argument and say she is not disorganized. You can give me every detail in the world, I'm never going to say it is organized.

*A*. I'm not trying to argue with you. I'm trying to simply inform the Court of my opinion.

*Q*. I know. I know. So what you are saying is, okay, it was one set of facts that she took the knives out and she hid them and she - -

Here is another one.

*A*. Okay.

*Q*. She knocks her mother out of the wheelchair because it would further disable her and allow [Evans] to continue stabbing.

That is just one that goes, if we were doing a check mark here, if we had a chalk board here, saying: Okay, one for you. One for me. Would that be one for me or one for you[?]

*A*. I'm not aware that was her intent.

*Q*. Clearly when she knocked a woman that she is stabbing or trying to murder out of a wheelchair and she is paralyzed, would you not think that further makes it so that she is less likely to be able to resist?

-14-

*A*. That could be one reason for it, but I don't know. There could be other reasons for why she fell out of the chair.

When Dr. Rowland again refused to opine regarding defendant's sanity after the murder, the prosecutor stated that he believed she was engaging in "hypocrisy;" specifically, the prosecutor stated: "This is the hypocrisy I'm pointing out to you."

Invective and name calling have no place in a cross-examination.

After being accused of "withholding" information from the jury, Dr. Rowland attempted to explain that she was trying to conform her testimony to the statutory definition of insanity. Dr. Rowland refused to opine regarding Evans's "intent" because she viewed that subject as "outside my purview." But the prosecutor persisted:

*Q*. Outside of your expertise. You're here testifying. You are an expert, I agree, forensic psychology. Let's talk about your expertise. Are you telling this jury that those [sic] acknowledgment of all of the things we're going to talk about, the second that she did after the murder, to –

*You do not at all in your training have you recognized that those are activities that could show the difference between right and wrong.*

*A*. That could in a certain sense.

*Q*. Okay. *There we go. Is that that hard*? This is what this whole case is about, is it, before during and after. Okay. And as an expert in the area, you can't just ignore the reality, can you?

I mean, you may not have put it in the report, but you recognize there are limitations to, then, your opinion based on actions that were taking place that you chose by your reading of the statute, not to include. I mean, let's put it this way. That was a bad question.

This jury, one of the reasons I want the jury to have this, I'm going to point out in closing argument to them what you did at the very end.

*A*. Okay.

*Q*. Okay. Starting at the last paragraph on page 25?

*A*. Yes.

*Q*. All the way through the last paragraph on page 26?

*A*. Yes.

*Q*. You talk about all the things she did afterwards. You talk about despite in the opinion of this evaluator mental illness day-to-day, several of her behaviors

recorded in the records and herself report suggest she retained the capacity to being able to assess and choose alternate behaviors.

And then you go on for a half page and describe everything we have been talking about. Hiding the knife, covering it up, throwing the phone away, taking the clothes, all of that. And you say well all of this - -

Here your report is acknowledging all that stuff is in there. But then you don't include any of that in your conclusion. You just simply say:

Despite looking at all of these things which kind of could show that there is some understanding of consequences, I'm not using them.

*A.* Actually I do mention that in my conclusion. And I could direct you to that last.

*Q.* Please, please, please. Let's go with it.

*A.* Okay. So, again, looking at statute I am (indiscernible) my opinion if there is mental illness or intellectual disability. I opine there was mental illness, and therefore, I want to look at the prongs to see if she appreciates the nature of her behavior.

After mischaracterizing Dr. Rowland's report by claiming that she failed to account for facts suggesting premeditation, the prosecutor again expressed his own beliefs in the process of accusing Dr. Rowland of being uncaring in a "moral" sense. In yet another attempted assassination of her character the prosecutor added:

*Q. Can you understand the jury's frustration, maybe my frustration. We are dealing black and white here. And you sort of have, like, a rationalization for everything when guilty is moral, but it is not that sort of moral.* It is all moral, morality and understanding and feeling guilty, just sort of fluid, like everything else in your field?

*A.* I'm trying to explain to the best that I can given the questions.[10]

The prosecutor's "frustration" was irrelevant. His comments regarding "morality" were intended to inflame the passions and prejudices of the jury rather than to genuinely explore the subject of Evans's mental state.

---

[10] ABA Standard for Criminal Justice (4t ed), Standard 3-6.7(a), provides: "The prosecutor should conduct the examination of witnesses fairly and with due regard for dignity and legitimate privacy concerns, and without seeking to intimidate or humiliate a witness unnecessarily."

## C. PLAIN ERROR

In sum, throughout his cross-examination of Dr. Rowland, the prosecutor accused Dr. Rowland of being a hypocrite, engaging in deceit, appearing purposefully dense, lacking intelligence, and ignoring or hiding evidence to make her opinion more palatable to the jury. The cross-examination was replete with prosecutorial misconduct. The error in allowing this cross examination was plain.

Under the plain error standard, reversal is warranted if "the plain error affected [defendant's] substantial rights." *Carines*, 460 Mich at 763. This requires "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings" or, alternatively, that the error seriously affected the fairness, integrity or public reputation of judicial proceedings. *Id*. These plain error components exist here.

Whether Evans was insane was the sole issue in the case. The people had no expert, and two experts testified on behalf of Evans. The prosecutor's strategy centered on attacking Dr. Rowland *personally* and repeatedly emphasizing that Evans's conduct was consistent with premeditation. As the experts endeavored to explain, however, premeditation is not necessarily antithetical to legal insanity.[11] And both experts pointed to abundant evidence that Evans suffered from persistent delusions, even while medicated. Their description of Evans's mental state at the time of the murder was consistent with a lack of substantial capacity to appreciate the nature and wrongfulness of her acts, and the prosecutor never effectively challenged that evidence.

Absent the prosecutor's brutal and improper cross-examination, there was more than a reasonable likelihood that a reasonable juror would have determined that Evans was legally insane when she murdered her mother. Alternatively stated, the prosecutor's misconduct affected Evans's substantial rights because it likely influenced the jury's verdict. We reiterate this Court's warning in *Unger*, 278 Mich App at 240: "[I]n a case that turns largely on conflicting expert testimony, a prosecutor must take special steps to avoid misconduct designed to impugn the integrity of the defendant's experts." This case exemplifies the rationale for that caution. The behaviors and characteristics of severely mental ill teenagers is beyond the ken of most jurors. Mental illness continues to carry a stigma. Overcoming uninformed beliefs and prejudices about mental illness is an uphill battle for a defendant in a case raising the defense of insanity. Maintaining the focus on science rather than emotion is critical to ensuring that a defendant receives a fair trial.

That focus was lost here, due to the prosecutor's effective effort to cloud the substance of the evidence supporting Evans's insanity with ad hominem attacks on Dr. Rowland. Our Legislature has determined that a mentally ill defendant must be permitted to invoke an insanity defense. As a representative of The Center for Forensic Psychiatry, Dr. Rowland was the state's designated representative regarding the appropriateness of that defense. Although she testified to having performed more than 1,500 evaluations on behalf of the Center (the vast majority of which

---

[11] Indeed, Evans at one point asserted that she hid the knives to prevent her family from killing her.

-17-

led to testimony on behalf of the prosecution), the cross-examination dishonorably reduced her opinions and her professional status to ashes.

In addition to finding prejudice, we have no difficulty concluding that the prosecutor's misconduct seriously affected the fairness, integrity or public reputation of the trial. The prosecutor's unprofessional and unethical conduct led to the first-degree murder conviction of a mentally ill 17-year-old, and a sentence of life imprisonment without parole. While that may ultimately prove a fair resolution, to safeguard the integrity of the process an untainted jury will have to determine Evans's guilt.

We vacate and remand for a new trial. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle
/s/ Jane M. Beckering